**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANTHONY JOHN SULLY,
            *Petitioner-Appellant*,

v.

ROBERT L. AYERS, JR., Warden of
California State Prison at San
Quentin,
            *Respondent-Appellee*.

No. 08-99011

D.C. No.
3:92-CV-00829-
WHA

OPINION

Appeal from the United States District Court
for the Northern District of California
William H. Alsup, District Judge, Presiding

Argued and Submitted
April 16, 2013—San Francisco, California

Filed August 6, 2013

Before: Sidney R. Thomas, Marsha S. Berzon,
and N. Randy Smith, Circuit Judges.

Opinion by Judge Thomas

## SUMMARY[*]

### Habeas Corpus/Death Penalty

The panel affirmed the district court's denial of a 28 U.S.C. § 2254 habeas corpus petition challenging a murder conviction and capital sentence.

The panel affirmed the district court's denial of relief as to petitioner's ineffective assistance of counsel claims. The panel held that petitioner failed to show prejudice as to his claims that trial counsel was ineffective for failing to: investigate and present mitigating evidence of his mental disorders at sentencing, investigate and present a mental state defense, investigate and present evidence of incompetence or request a competency hearing, or investigate and impeach the credibility of a witness. The panel also affirmed the denial of relief as to petitioner's claim that counsel was ineffective by calling a deputy district attorney to testify during the penalty phase, given the "already staggering" aggravating evidence presented.

The panel also held that the state court was not unreasonable in concluding that petitioner was competent to stand trial and waive fundamental rights.

The panel held that the trial court's limitation of petitioner's cross-examination of a witness did not violate the Confrontation Clause and was not contrary to or an unreasonable application of clearly established federal law

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

because the excluded topics of cross-examination likely would not have affected the jury's impression of the witness' credibility.

The panel also affirmed the denial of relief as to petitioner's claim of cumulative prejudice from counsel's error, as well as the district court's denial of an evidentiary hearing.

## COUNSEL

Richard B. Mazer, San Francisco, California, for Petitioner-Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Glenn R. Pruden, Supervising Deputy Attorney General, Alice B. Lustre and Gregg E. Zywicke (argued), Deputy Attorneys General, San Francisco, California, for Respondent-Appellee.

## OPINION

THOMAS, Circuit Judge:

A California jury convicted Anthony John Sully of six counts of first-degree murder and sentenced him to death. The California Supreme Court summarily denied Sully's state habeas petition, and the district court granted Respondent's motions for summary judgment with respect to Sully's federal habeas petition. Sully now appeals the district court's decision. We affirm.

I

A[1]

For eight years, Sully served as a police officer for the City of Millbrae. After he left the police force he established a successful electrical contracting business, which he operated out of a warehouse in Burlingame. Around the same time that he left the police force and started his business, Sully began investing in an "escort service" and regularly engaging the services of prostitutes. He also became addicted to freebasing cocaine.

During a period spanning six months in 1983, Sully tortured and brutally murdered six people. His first victim was Gloria Fravel, a prostitute who worked for the escort service of Tina Livingston. On a Friday afternoon in February 1983, Livingston and another prostitute, Angel Burns, brought Fravel to Sully's residence, which was located in the front of his warehouse. There, Sully asked Fravel for a date, and when she declined, slapped her across the face and directed her to go to the back of the warehouse.

Sully kept Fravel in the back of the warehouse through the weekend. He gagged and handcuffed her, suspended her from the ceiling, and repeatedly raped her, pausing at intervals to freebase cocaine. When Fravel's gag came loose and she screamed for help, Livingston and Burns tried to silence her by tightening a hangman's noose that Sully had

---

[1] This summary of Sully's background and crimes is based on the California Supreme Court's decision affirming Sully's conviction and sentence on direct appeal. *People v. Sully*, 812 P.2d 163, 170–74 (Cal. 1991).

placed around her neck. Then Sully intervened, tugging hard on the noose until Fravel's body went limp and her bodily fluids spilled out. Sully and Burns then moved Fravel's body to a car and drove away to dispose of it. After they discovered that Fravel was not yet dead, Sully pulled the car to the side of the road and hacked at Fravel with a hatchet. When Sully and Burns were certain Fravel was dead, they dumped her body on the side of Skyline Boulevard. Later, Sully read a newspaper clipping to Livingston about the discovery of Fravel's body; he found it humorous and apt that her body was discovered by a butcher.

Shortly after Sully murdered Fravel, he told Livingston he wanted to kill a "new" prostitute—one who had not yet had sex for money—before anyone else "had" her. In April 1983, Burns brought nineteen-year-old Brenda Oakden to Sully's warehouse, where Sully killed her. Oakden's body was found in a barrel in Golden Gate Park; she had died from a gunshot wound to the back of her head.

Sully killed Michael Thomas and Phyllis Melendrez in a similar fashion. He told another escort service owner that he had murdered a pimp and a prostitute and stuffed their bodies into barrels. He said that he would kill anyone who tried to rip him off, and he described how profusely the pimp and prostitute bled when he shot them. As with Oakden, the bodies of Thomas and Melendrez were found in barrels in Golden Gate Park. They too had died from gunshot wounds to the back of their heads.

Sully murdered Barbara Searcy when she went to his warehouse to collect money he owed her. After killing Searcy, Sully gave Livingston a bag of Searcy's belongings and encouraged her to burglar Searcy's apartment to recover

a recording he had left on her answering machine. Later, Sully showed her Searcy's body and told her that he killed Searcy for "personal reasons." The two then dragged Searcy's body behind Sully's pickup truck to render it unidentifiable.

Sully's final known murder victim was Kathryn Barrett. Barrett, a drug dealer, had offered to sell Sully six ounces of cocaine. Sully and his friend, Michael Francis, decided to steal the cocaine from Barrett. At Sully's request, Livingston drove Barrett to Sully's warehouse and then went to a local bar to wait. Two hours later, Sully called Livingston to tell her she did not need to pick up Barrett.

When Livingston returned to the warehouse, she saw Francis stabbing Barrett in the chest. As she turned to leave, Sully assured her that Barrett would not be recognizable even if someone found her. When Sully learned that Barrett had not yet died from the wounds Francis inflicted with his knife, he became disgusted and slammed a sledgehammer into Barrett's face. Later, a visibly ill Francis told Livingston that he could not forget the sound of Barrett's bones cracking.

Sully was arrested in August 1983. Following his arrest, he offered Francis $10,000 to "take the fall" for Searcy's murder, and an additional $10,000 to do the same for Barrett's murder. Sully pled not guilty, and proceeded to trial in San Mateo County Superior Court. The trial court appointed Douglas Gray (now deceased) as lead counsel to represent Sully.

B

1

At trial, the prosecution presented overwhelming physical and testimonial evidence establishing Sully as the murderer. For example, Sully's fingerprints and palmprints were found on the barrels containing the corpses of Thomas, Melendrez, and Oakden. The plastic bags used to wrap Thomas's corpse resembled plastic bags recovered from Sully's van, and they shared a design defect. Sully's footprint was found on a trash bag near Searcy's body, and yellow rope used to bind Searcy's ankles matched yellow rope found in Sully's warehouse. Similarly, Sully's footprint was found on the plastic sheeting used to wrap Barrett's body, and other physical evidence found on or near Barrett's body linked her murder to Sully's warehouse.

In addition to physical evidence, the prosecution presented the testimony of Livingston, who testified pursuant to a plea agreement.[2] The prosecution also introduced evidence establishing that on three other occasions Sully imprisoned, bound, beat, and raped three women in his warehouse while freebasing cocaine. The three women survived their ordeals, but their experiences closely resembled those of Sully's alleged murder victims.

---

[2] Under the terms of the agreement, Livingston pleaded guilty as an accessory to Barrett's murder, admitted a 1976 manslaughter conviction, agreed to submit to a polygraph examination, and agreed to testify truthfully and completely. In exchange, she received a three-year sentence.

Gray pursued a defense of complete factual innocence, portraying Sully as a former police officer and successful businessman who, though he became submerged in a world of drugs and prostitution, did not kill anyone. Sully testified at length on his own behalf, denying that he committed any of the murders and placing the blame on Livingston, Burns, Francis, and his other companions. Sully admitted to consuming massive amounts of cocaine, but denied that his drug use affected his emotions, memory, or ability to appreciate the criminality of his conduct. He also steadfastly denied committing crimes while under the influence of cocaine. To bolster Sully's defense of innocence, trial counsel called Dr. Sidney Cohen, a pharmacologist, to testify regarding the effects of cocaine on the user. Dr. Cohen testified that "planned aggression" is difficult under the influence of cocaine, that cocaine users remain aware of their conduct, and that cocaine users do not lose consciousness or otherwise experience "blackouts."

After a three-week trial and four hours of deliberations, the jury convicted Sully of six counts of first-degree murder with the special circumstance of multiple murder.

2

At the penalty phase, the prosecution presented evidence of Sully's past acts as aggravating circumstances. First, the prosecution asked the jury to consider Sully's treatment of the three women whom he subjected to violence but did not kill. Then, the prosecution presented the testimony of Sully's ex-wife. She testified that Sully became violent and threatening when she decided to divorce him in 1975. On the morning she and her eleven-year-old daughter moved out of Sully's house, he twisted the heads off her daughter's pet ducklings

and left them in the backyard, where daughter and mother found them. Within days of their separation, Sully began making threatening calls to his ex-wife at her workplace and at the residence of her friend, where she was staying temporarily. In one telephone call, Sully told her that he tore the ducklings apart to show her that he could do the same to her daughter, and that he was going to cut up her daughter's body in cubes and present them to her in a cardboard box. Sully also threatened to kill her parents, her daughter's father, and her daughter's paternal grandmother. He explained that because he was a police officer, he knew how to get rid of the bodies so that no one would ever find them. Sully's ex-wife's testimony was corroborated by a co-worker and the friend who was hosting her.

In addition to Sully's past violent acts, the prosecution noted for the jury that Sully took the stand and denied experiencing extreme mental disturbance, being under the domination of others, or lacking the ability to appreciate the criminality of his actions. The prosecution also asked the jury to consider the circumstances of each murder, particularly that Sully tortured his victims and mutilated their bodies. The prosecution further emphasized evidence of Sully's callousness, lack of remorse, and apparent pleasure from his deeds.

In response to the prosecution's case, trial counsel waived his opening argument and called ten witnesses to present mitigating evidence. The witnesses—who were neighbors, acquaintances, business associates, and a past girlfriend of Sully's—testified that prior to his arrest, Sully was a good friend, electrician, and employer. All the witnesses testified that they were surprised that Sully was arrested for murder.

Sully's former neighbor speculated that racoons killed the pet ducklings, not Sully.

The defense also called an assistant district attorney to explain why the government was seeking a life sentence for Angel Burns rather than a death sentence. On cross-examination, the assistant district attorney testified that the factors supporting a sentence other than death for Burns did not apply to Sully.

After hearing closing arguments, the jury sentenced Sully to death. On direct appeal, the California Supreme Court affirmed Sully's conviction and sentence. *Sully*, 812 P.2d at 170.

C

Sully filed a federal habeas petition on December 16, 1996, which was stayed while he exhausted his claims in state court. Sully then filed a state habeas petition alleging that Gray rendered ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). He alleged, among other claims, that defense counsel failed to adequately investigate and present mitigating evidence of mental disorders at the penalty phase, failed to adequately investigate and present a mental state defense at the guilt phase, and failed to adequately investigate and present evidence of his incompetence to stand trial. Sully also alleged that he was actually incompetent to stand trial and waive his fundamental rights.

In support of his state habeas petition, Sully presented several declarations and medical records containing evidence that he suffered from major mental disorders at the time of

the murders and the trial. Defense counsel presented none of this evidence to the jury at either the guilt phase or penalty phase of Sully's trial.

According to the declaration of Dr. Philip Grossi, a licensed psychiatrist, defense counsel hired him to provide therapy for Sully and "keep a lid on things"—i.e., ensure that Sully did not lose his composure—during the trial. Over the course of sixteen months, Dr. Grossi visited Sully at least fifty times for a total of approximately 150 hours. Dr. Grossi did not formally evaluate or diagnose Sully, but it became apparent to him that Sully had "major mental disorders." He observed symptoms indicating "distortions in reality testing functions, emotional flooding, impoverished interpersonal relationships, disorganized thought processes, depression indicating potential affective disorder, the possibility of micro-psychotic episodes, cocaine psychosis, some indications of obsessive-compulsive disorder, the possibility of a personality disorder, delusional thinking, some level of anxiety, and denial." Dr. Grossi concluded that Sully's extreme cocaine use likely exacerbated his symptoms, and he noted that Sully's drug addiction sometimes affected his ability to recall events.

To assist in providing supportive and abreactive therapy[3] for Sully, Dr. Grossi hired Dr. Mark Elin, a psychologist, to interview Sully and conduct psychological tests. Dr. Elin observed no bizarre or unusual behaviors during the testing sessions. However, from tests of Sully's cognitive functioning Dr. Elin detected the presence of "a disturbing psychological process" that acted "to interfere and to

---

[3] According to Dr. Grossi, "abreactive" therapy meant "providing emotional support and quietly listening to" Sully.

constrict" Sully's thinking capacities. Similarly, from tests of Sully's personality functioning Dr. Elin concluded that Sully was "a very depressed, schizoid looking person who uses denial, particularly for sexual and aggressive material, repression, obsessive-compulsion, and projective defenses to ward off superficial interpersonal relationships and mask his internal dysphoria and mounting aggressivity." In particular, the results of Sully's Rorschach inkblot tests "underscore[d] the overwhelming aggression, tension, paranoia and primitive defensive structuring in his life." The testing data also indicated that Sully would turn to drugs and alcohol to solve his problems.

The profile of Sully's Minnesota Multiphasic Personality Inventory ("MMPI") strongly suggested "a chronic emotional disturbance, most likely a character disorder or paranoid type of schizophrenia." While Sully's test pattern resembled those of psychiatric outpatients who later require inpatient care, one interpretation of Sully's MMPI profile suggested that a rehabilitation program focused on work and recreational hobbies would help Sully channel his tension and hostility into socially acceptable activities. Conversely, another interpretation of Sully's MMPI profile indicated that no psychiatric treatment of any kind could help. Dr. Elin's ultimate diagnosis was "[n]arcissistic character disorder with an underlying borderline organization."

Sully's state habeas petition also included records of his stay at Chope Community Hospital following his arrest for rape in 1983. Sully was admitted to the hospital on a psychiatric referral after he threatened to commit suicide and became afraid the police were going to kill him. He was treated with antipsychotic medication and Valium. Hospital staff observed that Sully was angry, hostile, and verbally

abusive, while police deputies stated that he was not in a "stable mental state."

In addition to the contemporaneous evidence bearing on Sully's mental health, Sully offered a 1997 declaration from Dr. George Woods, a psychiatrist who examined Sully on several occasions following his conviction. After examining Sully and reviewing his background records and trial transcripts, Dr. Woods concluded that Sully's symptoms were consistent with someone who suffered from acute cocaine psychosis, and that the psychological effects of Sully's psychosis affected his capacity to appreciate the criminality of his conduct. Dr. Woods criticized the guilt-phase testimony of Dr. Cohen, noting that Dr. Cohen never interviewed Sully and did not have data regarding Sully's level of cocaine consumption. Dr. Woods pointed out contradictions between Dr. Cohen's testimony and his own past writings, where he had acknowledged that cocaine use can lead to paranoia, violence, and even homicides; that extreme cocaine consumption can have severe physiological effects on the user; and that in some instances cocaine users can lose their ability to appreciate the wrongfulness of their conduct.

Dr. Woods concluded that Sully's cocaine psychosis was superimposed over longstanding mental and emotional impairments, including a "mental disorder with potentially psychotic features." According to Dr. Woods, Sully suffers from symptoms consistent with obsessive compulsive disorder, an affective disorder, and schizophreniform spectrum disorders. These symptoms, say Dr. Woods, constituted substantial mitigating evidence at the time of trial because they affected Sully's ability to monitor his behavior and inhibit his impulses, because they affected Sully's

capacity to appreciate the criminality of his conduct, and because they left him vulnerable to domination by others. Dr. Woods further concluded that Sully's mental disorders rendered him incompetent to stand trial because they interfered with his ability to understand the nature of the proceedings and to aid counsel in his defense.

In addition to the mental health evidence Sully proffered in support of his state habeas petition, Sully proffered the declaration of John Balliet, an attorney who was appointed to assist Gray four months before trial. Balliet stated that although he was not involved in making any of the strategic decisions regarding investigation or defense theories, his discussions with Gray led him to believe that Gray "put all of his eggs in the guilt phase basket; if he lost the guilt phase there was an assumption Mr. Sully would be sentenced to death." Put more simply, the penalty phase was "an afterthought" to Gray. Balliet was not aware of any investigation into Sully's mental illness, the effects of his cocaine use, or the possibility of a mental state defense. At both phases of the trial, Gray frequently handed responsibility for examining witnesses to Balliet without any prior warning. Sully was not able to obtain a declaration from Gray before Gray's death.

The California Supreme Court summarily denied Sully's state habeas petition on the merits. Following the California Supreme Court's summary denial, Sully returned to the district court and filed an amended federal habeas petition. His federal petition contained the same claims that Sully raised in his state petition, plus several more, and it relied on the same supporting documents. The district court granted summary judgment in favor of Respondent in four separate

orders between 2003 and 2008. In its final order, the district court denied Sully an evidentiary hearing.

The district court granted a certificate of appealability with respect to four claims: Claim 3, alleging penalty-phase ineffective assistance for failure to investigate and present mitigating evidence relating to his mental disorders; Claim 4, alleging guilt-phase ineffective assistance for failure to investigate and present a mental state defense; Claim 5, alleging ineffective assistance for failure to investigate and present evidence of Sully's incompetence to stand trial; and Claim 11, alleging that Sully was actually incompetent to stand trial and waive his fundamental rights.

Sully timely appealed the four certified claims. His opening brief also raised six uncertified claims, with respect to which we granted a certificate of appealability.

## II

We review de novo the district court's grant of summary judgment with respect to Sully's habeas petition, and we review the district court's factual findings for clear error. *Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005). We review for abuse of discretion the district court's denial of an evidentiary hearing. *Id.* "We may affirm the district court's decision on any ground supported by the record, even if it differs from the district court's rationale." *Lambert v. Blodgett*, 393 F.3d 943, 965 (9th Cir. 2004).

Because Sully filed his federal habeas petition after April 24, 1996, we apply 28 U.S.C. § 2254 as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214. *Lindh v.*

*Murphy*, 521 U.S. 320, 336–37 (1997). Under § 2254, a state prisoner may not obtain federal habeas relief for any claim that was adjudicated on the merits by a state court unless the state court's decision was (1) "contrary to" clearly established federal law as determined by the Supreme Court, (2) "involved an unreasonable application of" such clearly established law, or (3) "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

Section 2254(d) applies even where, as here, the state court summarily denied the state habeas petition without a reasoned opinion. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1402 (2011); *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011). "In these circumstances, [Sully] can satisfy the 'unreasonable application' prong of § 2254(d)(1) only by showing that 'there was no reasonable basis' for the California Supreme Court's decision." *Pinholster*, 131 S. Ct. at 1402 (quoting *Richter*, 131 S. Ct. at 784). In other words, where a state court issues a summary denial, "a habeas court must determine what arguments or theories . . . could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Richter*, 131 S. Ct. at 786. Even if *we* would grant federal habeas relief upon de novo review, § 2254(d) precludes such relief if there are "arguments that would otherwise justify the state court's result." *Id.*[4]

---

[4] Sully argues that § 2254(d) does not apply because the California Supreme Court's decision was not an "adjudication on the merits" within the meaning of the statute. His argument rests on the premise that

## III

The district court properly granted summary judgment with respect to Claims 3, 4, 5, and 11. Section 2254(d) precludes habeas relief because Sully has failed to establish that the California Supreme Court's decision denying his claims necessarily involved an unreasonable application of clearly established federal law.

## A

The district court was correct to grant summary judgment with respect to Claim 3, which alleges that trial counsel was ineffective for failing to investigate and present evidence of Sully's mental disorders as a mitigating factor at sentencing. Even assuming that counsel's performance was deficient, the California Supreme Court would not have been unreasonable

---

California's pleading rules improperly deprived him of the opportunity to factually develop his federal claims before the California Supreme Court summarily denied them. His argument fails in light of the fact that both *Pinholster* and *Richter* arose from the very same summary denial procedure. *Pinholster*, 131 S. Ct. at 1396 & n.1; *Richter*, 131 S. Ct. at 783. Indeed, the Supreme Court demonstrated its awareness of California's pleading rules when it explained in *Pinholster* that "the California Supreme Court's summary denial of a habeas petition on the merits reflects that court's determination that 'the claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief.'" 131 S. Ct. at 1402 n.12 (quoting *In re Clark*, 855 P.2d 729, 741–42 (Cal. 1993) (alteration in original)). To assess the merits of the petitioner's claims, the California Supreme Court "generally assumes the allegations in the petition to be true" and also reviews the trial record. *Id.* (citing *People v. Duvall*, 886 P.2d 1252, 1258 (Cal. 1995); *Clark*, 855 P.2d at 742). So the court does not fail to render an "adjudication on the merits" just because it does not grant an evidentiary hearing.

to conclude that Sully failed to show prejudice from counsel's errors.

1

The clearly established federal law with respect to claims of ineffective assistance is *Strickland v. Washington* and its Supreme Court progeny. *Pinholster*, 131 S. Ct. at 1403. To establish a claim of constitutionally ineffective assistance of trial counsel, the petitioner must show that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. To establish that counsel's performance was deficient, the petitioner must show that counsel's representation "fell below an objective standard of reasonableness" under "all the circumstances." *Id.* at 688. To establish prejudice from counsel's errors during the penalty phase of a capital case, the petitioner must show that "there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Pinholster*, 131 S. Ct. at 1403 (quoting *Richter*, 131 S. Ct. at 792).

2

Even if we assume that defense counsel's penalty-phase performance was deficient under *Strickland*, Sully has failed to show that the California Supreme Court necessarily would

have been unreasonable to conclude that counsel's performance did not prejudice him.

As in *Pinholster*, much of the additional mitigating evidence that Sully proffered in support of his habeas petition is of questionable mitigating value. *See* 131 S. Ct. at 1410. The jury could have concluded instead from the additional mitigating evidence that Sully was dangerous and "simply beyond rehabilitation." *Id.* (citing *Atkins v. Virginia*, 536 U.S. 304, 321 (2002)). For instance, Dr. Elin's report was replete with ominous references to Sully's inability to control his aggression. For example, in his summation of Sully's psychological test results, Dr. Elin explained that "an inordinate amount of frustration under conditions that are not well structured can release aggressive impulses" in Sully which "can reach suicidal and/or homicidal proportions." Dr. Elin further explained that "[t]here is little substantively holding [Sully] together once he comes in contact with his emotions." When confronted with his emotions, Sully's paranoia "will be unharnessed" and his potential for "acting out" will increase. When his delusional self-image of grandiosity is tarnished, his "aggressive tendencies" will overwhelm his repressive tendencies and "[e]xplosive, aggressive and passive-aggressive behavior will unfold." Finally, although one scoring metric in Dr. Elin's report indicated that Sully might benefit from a rehabilitation program, another scoring metric indicated that psychiatric treatment of any kind does not seem to help patients like Sully.

In contrast to this two-edged additional mitigating evidence, the aggravating evidence that the jury actually considered was staggering. The prosecution reminded the jury of evidence it heard during the guilt phase, particularly

evidence that Sully derived pleasure from torturing his six murder victims and mutilating their bodies. The prosecution also presented evidence that Sully had tortured and raped three other women who, fortunately, did not die. Finally, the testimony of Sully's ex-wife showed that Sully exhibited violent tendencies long before he became addicted to cocaine, significantly undercutting his argument that keeping him off cocaine allows him to lead a normal, peaceful life.

Faced with such extensive aggravating evidence, and considering the questionable mitigating value of Sully's proffered evidence, fairminded jurists could conclude that there is no "substantial" likelihood that the additional evidence of Sully's mental disorders would have altered the jury's sentence. *Richter*, 131 S. Ct. at 792. Therefore, we cannot say that, even assuming Sully's trial counsel performed deficiently, the California Supreme Court was necessarily unreasonable to conclude that Sully failed to show he was prejudiced by counsel's errors.

B

The district court was correct to grant summary judgment on Claim 4, which alleges that trial counsel was ineffective for failing to investigate and present a mental state defense. As with Claim 3, even if we assume that counsel rendered deficient performance during the guilt phase by failing to investigate and present a mental state defense, the California Supreme Court would not have been unreasonable to conclude that no prejudice resulted from counsel's errors.

To establish prejudice from counsel's errors during the guilt phase of a trial, a petitioner must show that "there is a reasonable probability that, absent the errors, the factfinder

would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. Where, as here, the petitioner was convicted of multiple counts of first-degree murder, the petitioner must show a reasonable probability that the jury would have returned a different verdict with respect to each of the murder counts. *See Cooper v. Calderon*, 255 F.3d 1104, 1110 (9th Cir. 2001) (finding no prejudice from counsel's failure to request second-degree murder instructions where petitioner, who had been convicted of four counts of first-degree murder, "failed to explain how the jury could have reasonably returned four second degree murder verdicts," and therefore could not "escape the fact that whether or not the second degree murder instructions were given, he would have been subjected to a penalty phase and the death penalty").

Sully's charged offenses took place after June 1982, so the defense of diminished capacity was no longer available to him. *See Daniels v. Woodford*, 428 F.3d 1181, 1207 n.29 (9th Cir. 2005) (citing *People v. Weaver*, 29 P.3d 103, 130 n.8 (Cal. 2001)). Therefore, to present a viable mental state defense, counsel would have had to show that "because of his mental illness or voluntary intoxication, [Sully] did not *in fact* form the intent unlawfully to kill" with respect to each of the six murders. *People v. Saille*, 820 P.2d 588, 596 (Cal. 1991); *see Cooper*, 255 F.3d at 1110. While Sully has proffered evidence showing that he was generally consuming large quantities of cocaine and suffering various psychotic symptoms around the time of the murders, none of the evidence relates to the impact of his cocaine usage or psychotic symptoms on specific instances of murder. Therefore, even assuming that counsel's performance was deficient, the California Supreme Court could have reasonably concluded that Sully failed to meet his burden of

showing a reasonable probability that the jury's verdict with respect to each of the six murder counts would have been different in the absence of counsel's errors.

C

The district court properly granted summary judgment with respect to Claim 11, which alleges that Sully was actually incompetent to stand trial and waive fundamental rights. The California Supreme Court was not necessarily unreasonable to conclude that Sully was competent.

A defendant may not be subjected to trial if he is incompetent. *Drope v. Missouri*, 420 U.S. 162, 171 (1975). "To be competent to stand trial, a defendant must demonstrate an ability to consult with his lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him." *Douglas v. Woodford*, 316 F.3d 1079, 1094 (9th Cir. 2003) (internal quotation marks and citation omitted). Factors relevant to Sully's competence include his "demeanor at trial," "any evidence of [his] irrational behavior," and "any prior medical opinion on [his] competence to stand trial. *Torres v. Prunty*, 223 F.3d 1103, 1108–09 (9th Cir. 2000) (citing *Drope*, 420 U.S. at 180).

Sully rests his claim on Dr. Woods's declaration, which opined that Sully's cocaine use and longstanding mental disorders combined to render him incompetent. In particular, Dr. Woods concluded that Sully could not rationally assist trial counsel because of his deep-seated paranoia, his pathological denial about his involvement in the murders, his inability to recall or relate factual information, and his inability to process verbal and visual information. Dr. Woods

also concluded that Sully could not understand the nature of the proceedings against him because he wrote to counsel demanding bail after over a year in county jail, he asked counsel to seek his release from the Supreme Court, and he once wrote to counsel expressing confidence that he would be released. Dr. Woods stated that he based his conclusions on both his own examination of Sully and contemporaneous evidence, including the assessments by Dr. Grossi and Dr. Elin, Sully's letters, medical records from Sully's psychiatric referral to Chope Community Hospital, and trial transcripts.

Generally, we disfavor retrospective determinations of incompetence like that of Dr. Woods, though we have been willing to examine them if they are based on contemporaneous medical records. *Boyde v. Brown*, 404 F.3d 1159, 1167 & n.7 (9th Cir. 2005), *amended by* 421 F.3d 1154 (9th Cir. 2005). While Dr. Woods's opinion purports to be based in part on contemporaneous evidence, that evidence either does not support or directly undermines his conclusions.

Both Dr. Grossi's declaration and Dr. Elin's psychological evaluation provided some support for Dr. Woods's opinion. For example, Dr. Grossi concluded that Sully exhibited symptoms of "distortions in reality testing functions," "micro-psychotic episodes," "delusional thinking," "disorganized thought processes," and "denial." Similarly, Dr. Elin believed that "a well circumscribed delusional process of paranoid proportions hides under the surface of [Sully's] pleasant and friendly demeanor," and that in "rare instances" Sully's repression may break down such that a "dissociate state develops which renders him unconscious to external events taking place around him." However, neither Dr. Grossi nor Dr. Elin suggested that

Sully's paranoid delusions and denial reached the level described in Dr. Woods's opinion. Moreover, in direct contradiction to Dr. Woods's conclusions, Dr. Elin expressly noted in his report that Sully exhibited no bizarre or unusual behaviors; had no obvious sensory, visual, or hearing difficulties; had good concentration and attention; and scored in the average range of cognitive functioning.

Dr. Woods's reliance on Sully's claims of suicide attempts to show severe mental impairment is similarly shaky: any probative value of Sully's suicide attempts is discounted because they occurred long before trial. *Boag v. Raines*, 769 F.3d 1341, 1343 (9th Cir. 1985).

Dr. Woods also relied in part on Sully's letters to counsel to conclude that Sully was incompetent. However, even if Sully's letters—which were not submitted to the state court—said what Dr. Woods claimed they said, they demonstrate Sully's ignorance of the workings of the legal system, not an inability to understand the nature and seriousness of the charges against him.

Finally, and most importantly, the transcript of Sully's trial strongly undermines any claim that Sully was incompetent. Sully's trial testimony, which lasted two days and spans over three hundred pages of the transcript, was detailed, cogent, and demonstrated that he was fully aware of the nature and seriousness of the proceedings against him. *See Benson v. Terhune*, 304 F.3d 874, 885–86 & n.13 (9th Cir. 2002) ("Benson's lengthy, logical and cogent trial testimony reflects a sufficient ability to understand the proceedings and to assist in her own defense."). For example, he attempted to rebut the prosecution's case against him by providing alternative explanations for the presence of his

fingerprint on one of the barrels in Golden Gate Park, his collection of newspaper clippings relating to Fravel's murder, and his encounter with one of the torture victims. Even Sully's profane outburst at the jury following the verdict indicated that he was aware and able to process the trial logically. *See Davis v. Woodford*, 384 F.3d 628, 647 (9th Cir. 2003) (finding that the defendant's becoming "hysterical and unfocusable" was likely the result of anger rather than a reflection of his incompetency). Other than this outburst, there is no evidence that Sully behaved irrationally or bizarrely at trial.

In addition to testifying at trial, Sully made an extended and lucid statement at the penalty phase. In that statement, Sully discussed the charges, the specific evidence against him, his perception of prosecutorial misconduct, the reasonable doubt standard, and the goals of the criminal justice system in general. Like his trial testimony, Sully's penalty-phase statement strongly suggests he was competent. *See Douglas*, 316 F.3d at 1094 (finding "strong evidence" of competency in the defendant's coherent testimony during a hearing in which he demonstrated that he "understood the charges against him" and "had paid close attention throughout the guilt phase" of his trial).

Given the strong evidence that Sully was competent to stand trial, and the lack of support for Dr. Woods's opinion, we cannot say the California Supreme Court must have been unreasonable to reject Sully's claim of incompetence. For the same reasons, we find that the California Supreme Court was not unreasonable to conclude that Sully was competent to waive rights such as the right to be present during sentencing.

D

The district court properly granted summary judgment with respect to Claim 5, which alleges that trial counsel was ineffective for failing to investigate and present evidence of his incompetence and that trial counsel was ineffective for failing to request competency hearings. As already explained, the California Supreme Court could have reasonably concluded that Sully was competent to stand trial and waive his fundamental rights. Therefore, even assuming that trial counsel's performance on this matter was deficient, the California Supreme Court could have reasonably concluded that any deficiency did not prejudice Sully. *See Boyde*, 404 F.3d at 1167.

IV

In addition to the four certified claims analyzed above, Sully's appeal raised six uncertified claims: Claims 8(e), 8(f), 9(c), 24, 39, and a claim that the district court erred in refusing to allow Sully to submit briefing in support of his request for an evidentiary hearing on his ineffective assistance claims. We granted a certificate of appealability as to those additional claims and ordered supplemental briefing. We now conclude that the district court properly granted summary judgment on those claims.

A

The district court properly granted summary judgment on Claim 8(e), which alleges that counsel was ineffective for failing to impeach the credibility of a hearsay statement introduced through Tina Livingston. Livingston testified that Michael Francis, who was not a witness at trial, told her that

Sully killed Kathryn Barrett by slamming a sledgehammer into her face. Sully argues that counsel was ineffective for failing to investigate and present evidence to impeach Francis's credibility.[5]

Sully has not shown that counsel was ineffective for failing to investigate and present evidence to impeach Francis's statement. First, the supposedly impeaching evidence that counsel failed to uncover and present—reports of police interviews of individuals who knew information about Barrett's murder, an alleged confession letter written by

---

[5] On appeal, Sully argues, for the first time, that counsel's failure to impeach Francis's statement prejudiced him by violating his Sixth Amendment right to confront witnesses against him. To the extent Sully claims a freestanding Confrontation Clause violation, he has waived it because he failed to raise it before the district court. *Poland v. Stewart*, 169 F.3d 573, 583 n.4 (9th Cir. 1998).

Even if Sully has not waived this claim, the California Supreme Court reasonably rejected it in its opinion affirming Sully's conviction. *Sully*, 812 P.2d at 183. At the time of Sully's conviction, a hearsay statement by an unavailable declarant was admissible if it bore "adequate indicia of reliability." *Ohio v. Roberts*, 448 U.S. 56, 66 (1980) (internal quotation marks omitted), *abrogated by Crawford v. Washington*, 541 U.S. 36, 68–69 (2004); *see Whorton v. Bockting*, 549 U.S. 406, 421 (2007) (explaining that *Crawford* does not apply retroactively). Statements were deemed adequately reliable if they fell within a "firmly rooted hearsay exception." *Roberts*, 448 U.S. at 66. The spontaneous utterance exception is firmly rooted, so under pre-*Crawford* law the Confrontation Clause was not violated by the admission of spontaneous and excited utterances. *White v. Illinois*, 502 U.S. 346, 355 n.8 (1992). Francis's hearsay statement was clearly a spontaneous and excited utterance—he made the statement shortly after Sully killed Barrett, and he was visibly ill from the events he described—so there was no Confrontation Clause violation. Therefore, Sully cannot show that trial counsel's failure to challenge Francis's statement on Confrontation Clause grounds was deficient or that he was prejudiced by counsel's performance.

Francis, and evidence regarding Francis's mental disorders and suicide attempts—either had no impeachment value or was inculpatory. Indeed, one interviewee said that Sully tried to pay Francis to "take the fall" for Barrett's murder, and another placed Sully at the murder scene in direct contradiction to Sully's testimony. Furthermore, while Francis's alleged confession letter is not in the record, two interviewees indicated that it corroborated Sully's role in the other killings. Trial counsel could have reasonably decided that presenting this evidence would have been more harmful than not.

Second, any failure to present the supposedly impeaching evidence did not prejudice Sully's defense. The jury was already well aware of Francis's role in the Barrett murder and that he might have had a motive to lie. Moreover, there was extensive physical evidence linking Sully to Barrett's murder. Therefore, there is no reasonable probability that the failure to present the additional evidence would have affected the jury's verdict with respect to the Barrett murder or the five other murders.

Because counsel's failure to present the proffered impeachment evidence was neither deficient nor prejudicial, the California Supreme Court's rejection of this claim was not unreasonable.

B

The district court properly granted summary judgment on Claim 8(f), which alleges that trial counsel was ineffective for failing to adequately investigate and present additional evidence to impeach Tina Livingston.

First, contrary to Sully's argument, counsel did not unreasonably fail to investigate impeachment evidence regarding Livingston's use of a firearm in a past assault. The record clearly shows that counsel investigated the assault; indeed, the "additional" evidence Sully relies upon is a report *to counsel* regarding the assault.

Second, counsel was not ineffective in failing to impeach Livingston with allegedly false accusations regarding her daughter's molestation. Sully points to no evidence that Livingston's accusations were actually false, so he has not shown that counsel's performance was deficient or prejudicial. Even if the accusations were false, there is no reasonable probability that admitting them would have made a difference because counsel had already extensively impeached Livingston using her prior manslaughter conviction, her prior false statements to police regarding her manslaughter offense, and her prior assault using a gun. Moreover, the jury was well aware of Livingston's role in the murders and her favorable treatment as a result of her plea agreement.

Third, counsel was not ineffective in deciding to submit Livingston's handwritten notes about the murders in order to impeach her claim that she could not read or write. Given Livingston's detailed testimony, counsel's extensive impeachment, and the ample physical evidence corroborating Livingston's testimony, it is highly unlikely that the notes—which are not in the record—played a significant role in the jury's assessment of Livingston's credibility.

In sum, counsel extensively and effectively impeached Livingston's credibility, so the California Supreme Court could have reasonably concluded that the omission of the

proffered impeaching evidence did not prejudice Sully's defense.

## C

The district court properly granted summary judgment on Claim 9(c), which alleges that counsel rendered ineffective assistance by calling a deputy district attorney to testify during the penalty phase. Although counsel's decision provided the witness an opportunity to explain why he believed Sully deserved the death penalty, the aggravating evidence was already staggering, so the California Supreme Court was not unreasonable to find no "substantial" likelihood that the witness's opinion tipped the scales. *Richter*, 131 S. Ct. at 792.

## D

The district court properly granted summary judgment on Claim 24, which alleges that the trial court violated the Confrontation Clause when it limited Sully's cross-examination of Livingston. The Confrontation Clause does not prevent a trial judge from imposing limits on a defendant's cross-examination of a witness. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). "On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination . . . ." *Id.* To state a violation of the Confrontation Clause, a defendant must show "that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." *Id.* at 680. "The defendant has met his burden when he has shown that '[a] reasonable jury might have received a significantly different impression of a

[witness's] credibility had counsel been permitted to pursue his proposed line of cross-examination." *Slovik v. Yates*, 556 F.3d 747, 753 (9th Cir. 2009) (quoting *Van Arsdall*, 475 U.S. at 680) (first alteration in original). Even where there is a Confrontation Clause violation, it is subject to harmless error analysis. *Van Arsdall*, 475 U.S. at 684.

Sully argues that he should have been permitted to question Livingston concerning two topics. The first was Livingston's alleged participation in a witchcraft ritual in which she painted herself purple and buried both a human fetus and a jar containing the names of the officers investigating her role in the killing of Darlene Moore. Defense counsel asserted that the evidence impeached Livingston's claim that she never killed anyone besides Moore, though he conceded that its impeachment value was "borderline" and "did not go to the heart of anything." The second topic was Livingston's allegedly false accusation that one of the officers investigating the Moore killing was engaged in narcotics trafficking. Defense counsel asserted that the evidence showed Livingston's history of making false accusations to deflect her own guilt.

There is no substantial likelihood that the excluded lines of cross-examination would have changed the jury's impression of Livingston's credibility. As already explained, trial counsel subjected Livingston to extensive cross-examination that tested her biases, motivations to lie, and consistency. *See Bright v. Shimoda*, 819 F.2d 227, 229 (9th Cir. 1987) (finding no Confrontation Clause violation where the witness was already subjected to "substantial cross-examination"). This cross-examination yielded Livingston's admission that she made false statements about her involvement in Moore's death. *See Evans v. Lewis*, 855 F.2d

631, 634 (9th Cir. 1988) (finding no Confrontation Clause violation where the excluded line of questioning was cumulative). Moreover, both lines of questioning were peripheral and went only to Livingston's general credibility, not her bias. *See id.* at 634 ("[T]he defendant's right to attack the witness's general credibility enjoys less protection than his right to develop the witness's bias."); *Bright*, 819 F.2d at 229 (explaining that the collateral nature of the excluded cross-examination is a factor counseling affirmance). The California Supreme Court decision affirming the trial court's limits on Sully's cross-examination was not contrary to, or an unreasonable application of, clearly established federal law.[6]

E

The district court properly granted summary judgment with respect to Claim 39, which alleges cumulative prejudice from counsel's errors. Given that the California Supreme Court was not necessarily unreasonable in concluding that Sully was not prejudiced by any of the alleged errors in isolation, it was also not necessarily unreasonable in concluding that Sully was not prejudiced by the alleged errors in the aggregate.

---

[6] The California Supreme Court decided this claim in its reasoned opinion affirming Sully's conviction and sentence on direct appeal. *Sully*, 812 P.2d at 176–78. Therefore, unlike with the court's summary denial, we consider for the purposes of § 2254(d) what arguments or theories actually supported the state court's decision, and "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Richter*, 131 S. Ct. at 786.

F

Finally, the district court did not err in refusing to allow Sully to submit additional briefing in support of his request for an evidentiary hearing on his claims of ineffective assistance. Sully had already fully briefed the issues and, as explained below, Sully was not entitled to an evidentiary hearing.

V

The district court did not abuse its discretion in denying Sully's request for an evidentiary hearing. Although the Supreme Court has declined to decide whether a district court "may ever choose to hold an evidentiary hearing *before* it determines that § 2254(d) has been satisfied," *Pinholster*, 131 S. Ct. at 1411 n.20 (emphasis added), an evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief. *See Pinholster*, 131 S. Ct. at 1411 n.20 ("Because Pinholster has failed to demonstrate that the adjudication of his claim based on the state-court record resulted in a decision 'contrary to' or 'involv[ing] an unreasonable application' of federal law, a writ of habeas corpus 'shall not be granted' and our analysis is at an end.") (quoting 28 U.S.C. § 2254(d)); *see also id.* at 1412 (Breyer, J., concurring in part and dissenting in part). Here, Sully failed to surmount § 2254(d)'s limitation on habeas relief, so he was not entitled to an evidentiary hearing.

CONCLUSION

The district court properly concluded that the state court decision was not an unreasonable application of clearly established federal law, as determined by the Supreme Court.

Therefore, we affirm the judgment of the district court denying the petition for a writ of habeas corpus.

**AFFIRMED.**