**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| RICHARD GALVAN MONTIEL, *Petitioner-Appellant*, <br><br> v. <br><br> KEVIN CHAPPELL, Warden, San Quentin State Prison, *Respondent-Appellee.* | No. 15-99000 <br><br> D.C. No. 1:96-cv-05412-LJO-SAB <br><br><br> OPINION |

Appeal from the United States District Court
for the Eastern District of California
Lawrence J. O'Neill, District Judge, Presiding

Argued and Submitted April 16, 2021
San Francisco, California

Filed August 5, 2022

Before: William A. Fletcher, Andrew D. Hurwitz, and
Michelle T. Friedland, Circuit Judges.

Opinion by Judge Friedland

# SUMMARY[*]

## Habeas Corpus/Death Penalty

The panel affirmed the district court's judgment denying Richard Galvan Montiel's habeas corpus petition in which he challenged his California conviction and capital sentence for a 1979 robbery and murder.

The California Supreme Court affirmed Montiel's conviction and sentence on direct appeal and later summarily rejected "on the merits" Montiel's state habeas petition. Montiel argued primarily that he was denied his Sixth Amendment right to effective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), at his 1986 penalty-phase trial. The district court certified two issues for appeal: first, whether his penalty-phase attorney, Robert Birchfield, rendered ineffective assistance of counsel by failing to present independent expert testimony from a psychopharmacologist that Montiel's intoxication with phencyclidine ("PCP") prevented him from being fully culpable for the crimes; and, second, whether Birchfield rendered ineffective assistance by failing to prepare defense witness Dr. Louis Nuernberger to testify regarding Montiel's mental health. In addition to pressing those certified issues, Montiel argued that Birchfield was ineffective for failing to investigate and challenge the factual foundation for the opinion of prosecution expert Dr. Robert Siegel, and for failing to investigate and present evidence of Montiel's psychosocial and family history to explain why he abused PCP and other drugs.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Applying *Browning v. Baker*, 875 F.3d 444 (9th Cir. 2017), the panel expanded the certificate of appealability to include the latter two claims, and considered whether Birchfield's performance, considered as a whole, amounted to ineffective assistance of counsel at the 1986 penalty trial.

Montiel argued that this court should review his *Strickland* claims de novo, because the California Supreme Court's four-sentence denial of his claims "on the merits," without issuing an order to show cause, signifies that the court concluded only that his petition did not state a prima facie case for relief such that there is no "adjudication on the merits" to which this court owes deference under the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d). The panel disagreed, citing *Cullen v. Pinholster*, 563 U.S. 170 (2011), in which the Supreme Court afforded AEDPA deference to the California Supreme Court's summary denial of a habeas petition raising a *Strickland* claim—even though the state court had not issued an order to show cause. The panel therefore applied the deferential AEDPA standard, asking whether the denial of Montiel's claims "involved an unreasonable application of" *Strickland*.

The panel assumed, for the sake of argument, that the alleged errors constitute deficient performance under the first prong of *Strickland*. The panel held, however, under AEDPA's highly deferential standard of review, that the California Supreme Court could reasonably have concluded that Montiel's claim fails under the second prong of *Strickland*. The panel wrote that, comparing the mitigation evidence that was offered with what would have been offered but for Birchfield's alleged errors, the state court could reasonably have decided that there was not a substantial likelihood that the jury would have returned a

different sentence if Birchfield had not performed deficiently.

The panel addressed uncertified issues in a memorandum disposition.

## COUNSEL

David A. Senior (argued) and Matthew L. Weston, McBreen & Senior, Los Angeles, California; Saor E. Stetler, Mill Valley California; for Petitioner-Appellant.

Julie A. Hokans (argued), Supervising Deputy Attorney General; Sean M. McCoy and Ivan P. Marrs, Deputy Attorneys General; Kenneth N. Sokoler, Supervising Deputy Attorney General; Michael P. Farrell and James William Bilderback II, Senior Assistant Attorneys General; Rob Bonta, Attorney General; Office of the Attorney General, Sacramento, California; for Respondent-Appellee.

## OPINION

FRIEDLAND, Circuit Judge:

In 1979, Richard Galvan Montiel was convicted by a California jury of the robbery and murder of Gregorio Ante, as well as the robbery of Eva Mankin. He was sentenced to death in 1986, following a penalty-phase retrial. The California Supreme Court affirmed Montiel's conviction and sentence on direct appeal and later summarily rejected "on the merits" Montiel's state habeas petition. Montiel filed a petition in federal district court for a writ of habeas corpus, which was denied.

Montiel appeals the district court's decision, arguing primarily that he was denied his Sixth Amendment right to effective assistance of counsel at his 1986 penalty-phase trial. The district court certified two issues for appeal: first, whether his penalty-phase attorney, Robert Birchfield, rendered ineffective assistance of counsel by failing to present independent expert testimony from a psychopharmacologist that Montiel's intoxication with phencyclidine ("PCP") prevented him from being fully culpable for the crimes; and, second, whether Birchfield rendered ineffective assistance by failing to prepare defense witness Dr. Louis Nuernberger to testify regarding Montiel's mental health. In addition to pressing those certified issues, Montiel argues that Birchfield was ineffective for failing to investigate and challenge the factual foundation for the opinion of prosecution expert Dr. Robert Siegel, and for failing to investigate and present evidence of Montiel's psychosocial and family history to explain why he abused PCP and other drugs. We expand the certificate of appealability ("COA") to include those issues and therefore consider all arguments Montiel raises concerning whether he received ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), at his 1986 penalty trial.

We address all four arguments related to Birchfield's performance at the 1986 penalty trial as a single issue of ineffective assistance of counsel, in compliance with *Browning v. Baker*, 875 F.3d 444 (9th Cir. 2017). We address that issue in this opinion. We decline to certify other issues for which Montiel seeks certification. We address those uncertified issues in a memorandum disposition that accompanies this opinion.

We review the California Supreme Court's denial of Montiel's *Strickland* claims under the deferential standard

required by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). We may grant relief only if "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). Although there is merit to Montiel's *Strickland* claims, we conclude that the California Supreme Court's ruling denying relief was not so lacking in justification that it meets that demanding standard. We therefore affirm the district court's denial of habeas relief.

## I.

## A.

At his 1979 trial, Montiel was represented by Eugene Lorenz. The focus of the defense was not to contest that, on January 13, 1979, Montiel had robbed Eva Mankin and killed Gregorio Ante. Rather, the defense's primary argument was that Montiel's intoxication with PCP and alcohol precluded him from forming the specific intent to commit the crimes.

The following facts are consistent with the California Supreme Court's summary in its decision on direct appeal from the 1979 guilt- and penalty-phase trials. *See People v. Montiel (Montiel I)*, 39 Cal. 3d 910, 916–20 (1985).

## 1. Prosecution's Case

On the morning of January 13, 1979, Montiel was sitting on the stairs outside his house when a neighbor who lived directly across the street, Eva Mankin, drove up to her home. Mankin began unloading grocery bags from her car, placing them on her front porch and setting her purse down next to

them. As she returned to her car to close the doors, she saw Montiel approaching through her front yard accompanied by two small children. Montiel reached the porch before Mankin could enter the house. He told her that he had come over to help her carry the groceries inside. Mankin thanked him, refused, and asked him to leave, but Montiel repeated himself two more times and the final time "lowered his voice" and "said it in such a tone that [she] knew he meant it." Mankin then opened the front door, and Montiel told each child to bring a bag into the house.

After bringing the bags inside, the children left, but Montiel remained, standing about six feet inside the home. Mankin noticed that his eyes were "staring" and "glassy." She asked him several times to leave but received no response, so she took him by the shirt and slowly led him outside. She went back inside the house and locked the door.

Montiel then broke the glass in the door and reached in to unlock it. He re-entered the house as Mankin was calling the police. Montiel demanded her purse, grabbed it, and ran out of the house. The police later found Mankin's purse in her car, missing two checkbooks, three bank books, and eight dollars in cash.

Later that morning, Montiel arrived at the home of Victor Cordova. Victor lived with his wife, Maury Cordova, Maury's sister Lisa Davis, and Lisa's boyfriend, Tom Stinnett, among others.[1] Stinnett was in the front yard when

---

[1] In *Montiel I*, the California Supreme Court spelled the Cordovas' last name as "Cardova" and spelled Maury's name as "Maruy." *See, e.g.*, 39 Cal. 3d at 917. We use the spellings supplied by Victor Cordova at the 1986 penalty trial and adopted by the California Supreme Court in *People v. Montiel (Montiel II)*, 5 Cal. 4th 877 (1993). *See, e.g.*, *id.* at 899.

Montiel arrived and walked into the house.  Although Maury was acquainted with Montiel, Stinnett did not know him and followed him inside.  Stinnett noticed that Montiel had a cut on his left arm by the wrist, and he helped Montiel clean and bandage the wound.  In the process, he removed a piece of skin from Montiel's arm with a razor blade.  According to Stinnett, Montiel told him that he "did a purse snatch and went through a window."  Stinnett observed that Montiel seemed "jittery" and "shaky" and appeared to be under the influence of drugs.  Montiel gave a checkbook to Maury, asking her to cash some checks and buy him some clothing.  Maury refused, so Victor gave Montiel a change of clothes.

Maury noted that Montiel was acting strange that morning.  She testified that Montiel entered the house without knocking, which was unusual.  She said that he was "more rowdy" than normal, "acted meaner," and was "giving orders," whereas before he had been "polite."

Lisa Davis did not know Montiel but testified that he acted "kind of weird."  At one point, Montiel tried to wipe a mole under her eye without explanation, and, later, he grabbed her arm and her purse and told her to get him some beer.[2]

---

[2] The prosecution's witnesses gave varying responses about Montiel's speech and movements that morning.  Mankin noted that "[h]e walked slow" but said that she did not notice slurring in his speech or unevenness in his walk.  Stinnett noted that Montiel was "talking fast, half of it was Spanish, half of it was English" but said that he noticed nothing unusual about Montiel's walk or other movements, other than that Montiel appeared "nervous" and "shaky."  Maury did not notice anything unusual about Montiel's eyes or the way he walked, and she said that his speech was not slurred.  She did, however, note that he appeared to be under the influence of PCP.  Victor testified that Montiel

Eventually, Victor Cordova took Montiel by motorcycle to Montiel's brother's house. On the way, Victor's motorcycle broke down. The men dismounted, and Victor pushed the motorcycle toward a nearby gas station. Victor called Maury from a payphone, asking her to pick them up, and began working on the motorcycle. At the same time, Montiel walked up the driveway of a nearby house. About ten minutes later, Montiel returned and told Victor that "he just killed a man," and Victor testified that Montiel "made an expression like he killed him, like, you know, like you do a goat." Montiel told Victor that he had left two beer cans in the man's house and, in a threatening manner, asked Victor to retrieve them. Victor refused, so Montiel left and soon returned carrying a can of beer and a sack.[3]

About fifteen minutes later, Maury Cordova and Tom Stinnett arrived in a pickup truck. Victor and Stinnett loaded the motorcycle into the back of the pickup. Victor rode in the back with the motorcycle, and Montiel rode in the cab with Maury and Stinnett. According to Stinnett, Montiel said that "he cut some man's head off" and that "he was the devil and a ride with him would be on top." When they arrived at the Cordova's house, Victor and Montiel went into

---

"wasn't making no sense" and "was high tempered," and that Victor "knew he was messed up on PCP." When asked about Montiel's movements, Victor said that he "was walking different" and that "his coordination was off a little." Davis said that "[h]is words were kind of stuttering, and they didn't come out right."

[3] When asked to describe whether Montiel showed signs of PCP intoxication shortly after the murder, Victor described Montiel's actions as "more or less the same" as before but said that "[h]e was talking more clearly."

a bedroom, where Montiel produced over $300 in twenty-dollar bills, as well as some pennies.

Victor told Montiel to leave the house and called a taxi. Montiel "was still flipping out, still talking," saying "[h]e was the devil." When no taxi arrived, Victor drove Montiel to a motel and dropped him off. Later that day, Maury discovered a sack in her bedroom containing Mankin's checkbooks, a large number of pennies, and a 12-inch "butcher knife" that was "covered in blood and had a broken handle."[4] Maury and Stinnett washed off the knife and threw it into a nearby canal. Later that night, Montiel returned to the Cordovas' house to ask about the knife, and Victor and Maury told him not to worry about it.

The next day, the police contacted Victor. When Victor saw Montiel later that day and asked if he knew what he had done, Montiel nodded his head. Subsequently, Montiel told Victor that he was worried he might have left fingerprints on the telephone in the man's house. Soon after, Victor left California to avoid testifying. He was arrested about two months later in Arizona as an accessory after the fact and returned to California to testify in exchange for immunity.

The murder victim was a 78-year-old man named Gregorio Ante. At trial, his relatives testified to the following events. On the morning of the murder, Gregorio's son Henry Ante arrived at his father's house to help with some repairs and to help his daughter, who arrived soon after, move a piano that she was purchasing from Gregorio.

---

[4] Stinnett also described seeing the paper sack containing "three or four dollars['] worth of pennies, checkbooks, some bank statements, [and an] old rusted[-]up knife." Davis also saw the items and testified that she later rolled up the pennies, counting seven dollars' worth.

Henry's daughter paid Gregorio $200, and Henry saw Gregorio place the money in his left shirt pocket. Henry's daughter drove away with the piano. Gregorio then gave Henry a twenty-dollar bill from the shirt pocket, after looking through his pants pockets and finding only a ten-dollar bill in the left pocket and two one-dollar bills in the right. Henry left, and as he went out the front door, he saw two men on a motorcycle in front of the house.

David Ante, Gregorio's grandson, arrived a short time later and found his grandfather's body on the floor. The body was found in a pool of blood, with the left pocket of Gregorio's pants pulled out. There was $180 in the left pocket of Gregorio's "inside shirt," which he wore underneath another layer, and no other money was found on his person. In his bedroom, the mattress had been moved off the bedframe, and the pennies that Gregorio collected were missing.

The autopsy revealed two superficial wounds on Gregorio's right cheek, two on the side of his neck, one on the lower neck, and one large, deep wound mid-neck, probably caused by at least two separate thrusts. The large wound was about seven inches wide and three inches deep. The cause of death was a hemorrhage with obstruction of the airway.

A few days after Gregorio Ante's death, Montiel was arrested and placed in a cell with an inmate named Michael Palacio. Palacio testified at trial that Montiel admitted to him that he had entered a man's house to use a telephone. When Montiel hung up the telephone, an old man appeared and asked what he was doing. The man sat down in a chair, and Montiel saw money in the man's shirt pocket. Montiel retrieved a knife from the kitchen, cut the man's throat, and, according to Palacio, took approximately $200. In exchange

for Palacio's testimony, the State dismissed a felony charge against him for possession of marijuana while in state prison.[5]

Dr. Ronald Siegel testified at trial as an expert for the prosecution.[6]      He      was      a      psychologist      and psychopharmacologist who worked with PCP and had published papers about its effect on behavior, and specifically on criminal behavior.  Dr. Siegel explained that PCP was a drug that could have "a combination of different effects"—it could act as a stimulant, cause a loss of response to pain, produce an anesthetic reaction in sufficient doses, produce "extreme sensory reactions" like seizures, cause hallucinations, and trigger changes in perceptions, thinking, and mood.  Dr. Siegel agreed that the effects of PCP are "extremely individualized."  While he acknowledged that it would be helpful to know how much of the drug someone had ingested to assess its effect on that person's behavior, Dr.    Siegel    explained    that    "in    the    field    of psychopharmacology, which is my field, the most important thing that we use is the actual behavior of the person as observed or witnessed by the people or themselves."

Dr. Siegel described the difference between PCP intoxication and PCP-induced psychosis.  He explained that PCP psychosis refers to a mental state characterized by rapid changes in mood, paranoia, and a preoccupation with death or death-like thoughts, which can include a fixation on

---

[5] Palacio admitted on cross-examination that he had read accounts of the crime in the newspaper before he approached the deputy sheriff with his offer to testify about Montiel's confession.

[6] The California Supreme Court gave only a brief summary of Dr. Siegel's testimony in *Montiel I.  See* 39 Cal. 3d at 919.  We expand on that summary here.

religious concepts like God or the devil. He testified that people in a state of PCP psychosis might also suffer from paranoid delusions or grandiose delusions (*e.g.*, believing that they are capable of performing, and attempting to perform, "unrealistic feats of strength or other types of powers").

Dr. Siegel reviewed transcripts of the earlier trial testimony of Victor and Maury Cordova, Stinnett, Davis, and Palacio; the police reports containing interviews with the witnesses; the preliminary hearing transcript; and background psychological and counseling reports about Montiel. He also interviewed Maury, Stinnett, and Davis.

Dr. Siegel opined that Montiel's behavior was consistent with a low to moderate level of PCP in the blood but not consistent with PCP-induced psychosis. Dr. Siegel based his opinion on Montiel's behavior at the time of the crimes, which indicated that Montiel was experiencing a state of hyper-excitation characterized by difficulty talking or slurred or stuttering speech, demanding and impulsive behavior, and glassy or dilated eyes. Dr. Siegel noted that most witnesses described Montiel as walking somewhat normally and that no one observed Montiel with two of the "signposts" of a high level of PCP intoxication—a flushed complexion (hypertension) and oscillation of the eyeballs (nystagmus). Dr. Siegel observed that Montiel was able to describe the killing of Gregorio Ante and recalled leaving beer cans in the house, which indicated that any amnesia was not severe, and noted that Montiel retained enough motor coordination to use the telephone and retrieve a large number of pennies without dropping them on the floor. Dr. Siegel further noted that, before the murder, Montiel was responsive to Maury Cordova's directions as she and Stinnett assisted him with the cut on his arm and that, after

the murder, Montiel insisted that he knew what was going on. In Dr. Siegel's view, those statements suggesting Montiel's lucidity further negated a conclusion of PCP psychosis.

Dr. Siegel rejected the idea that Montiel's statements about being the devil indicated that he was in a PCP-induced psychotic state. He noted that Montiel made those statements only after killing Gregorio Ante. According to Dr. Siegel, the timing suggested that the killing might have triggered an association causing Montiel to describe himself as the devil, but there was little to suggest that Montiel believed he was the devil before the killing or that such a hallucination caused him to kill.

Dr. Siegel concluded that although Montiel was under the influence of PCP, his level of intoxication was not sufficient to diminish his capacity to form specific intent or to premeditate. Based on Palacio's testimony, Dr. Siegel testified that Montiel had formed the intent to kill when he saw money in Gregorio Ante's pocket. Finally, he opined that Montiel's flight from the scene and expressions of concern the following day about possible evidence that he had left behind demonstrated his ability to reflect on the nature and consequences of his actions.

## 2. Defense's Case

Montiel took the stand on his own behalf and testified to the following. Around the time of the events, he had been smoking three to four PCP cigarettes per day. On January 13, 1979, he woke up, bought a six-pack of beer, and smoked a PCP joint. He felt a floating sensation from the PCP. When he saw Eva Mankin arrive at her house, something told him to help her with her groceries, so he ran to her house and carried the bags inside. His memory was spotty, but he

recalled that he put his hand through the glass in her door and did not feel any pain. Mankin yelled and swung her purse at him, and he grabbed it. He walked away from the house and dropped the purse, and when various items fell out, he picked them up and placed the purse in her car. As he jogged away, he noticed checkbooks in his hand and decided to return them later.

Montiel walked to the Cordovas' house with a bloody arm, and as he approached, he saw three people out front, two of whom appeared to be wearing white uniforms. He said to them, "oh, you're waiting for me, huh," and then walked into the house. When Stinnett used the razor to cut the piece of skin off his arm, Montiel felt no pain.

Montiel asked Victor to take him to his brother's house. Before they left, he and Victor smoked a joint of PCP. On the way, they stopped at the liquor store, and Montiel bought two cans of beer. After the motorcycle broke down, Montiel walked to a house to use the telephone, and he remembered that his feet felt heavy. When he reached the door, he knocked but got no answer. He looked in through a window in the front door and saw a man lying in blood. He then returned to Victor and said that he had seen someone with his throat cut, not that he had cut someone's throat.

Montiel said that he relayed the same story to Stinnett, but Montiel testified that he did not remember telling anyone that he was the devil. According to Montiel, when Victor asked him the following day if he recalled what he had done, Montiel nodded "yes" because he assumed that Victor was asking about how he injured his arm. As to Palacio's testimony regarding Montiel's confession in jail, Montiel asserted that he only repeated to Palacio what the public defender had read him from the police report.

Dr. Ronald Linder testified as an expert for the defense.[7] Dr. Linder held a doctorate in education and health science and wrote his doctoral dissertation on drug abuse. He was involved in PCP research and had written numerous articles on PCP toxicity. Before testifying, Dr. Linder interviewed Montiel for two and a half hours and read transcripts of the earlier witnesses' testimony at trial. Montiel described to Dr. Linder his extensive history of drug abuse, which began at a young age.

Dr. Linder noted that many people experience a mind-body separation while using PCP and may feel that they have no control over what they see their body doing, even though their actions are dangerous to themselves or others. He said that the effects of PCP on behavior and mental state fluctuate rapidly and have only an attenuated relationship to the amount of the drug in the bloodstream. Dr. Linder opined that, as a result, Dr. Siegel could not reliably infer from Montiel's behavior at one moment that Montiel had a low, moderate, or high level of PCP intoxication at another moment.

According to Dr. Linder's assessment, Montiel was significantly intoxicated before and during the crimes. He pointed to Montiel's inability to feel pain after putting his hand through a glass window, his aggressive and impulsive behavior, and the killing itself and concluded that Montiel was in a "delusional state." Dr. Linder noted that Montiel's claims to be the devil were similar to other cases where PCP users had committed violent acts and described themselves or the victim as the devil. Dr. Linder discounted the absence of observed signs of hypertension or nystagmus, explaining

---

[7] The California Supreme Court did not summarize Dr. Linder's testimony in *Montiel I*. *See* 39 Cal. 3d at 919–20. We do so here.

that moderate hypertension might not cause an obviously flushed appearance and that nystagmus might not be noticeable to the untrained observer. In Dr. Linder's opinion, Montiel's level of intoxication would have prevented him from premeditating or weighing the considerations for and against killing.

On cross-examination, Dr. Linder conceded that, if Montiel said that he had stolen a purse and taken checkbooks from it, one could infer from those facts that Montiel had an intent to steal. Dr. Linder clarified, however, that the effects of PCP were so unpredictable that a user could act rationally one minute and irrationally the next. Based on his judgment and knowledge of PCP, Dr. Linder opined that Montiel was not in a state that would "consistently allow him to premeditate." Dr. Linder could assume only that Montiel was intoxicated with PCP but said he doubted that Montiel could have formed an intent to steal.

### 3. Prosecution's Rebuttal

On rebuttal, prosecution witnesses testified that there was no window in Gregorio Ante's front door and that an observer looking through an adjacent window could not have seen that Gregorio Ante's throat was cut. The public defender testified that he had represented Montiel at his arraignment and acknowledged that he normally would not have supplied a defendant with a police report at the time indicated, and the prosecution's investigator described how Palacio's version of events contained information that was not in the police reports anyway.

### 4. Verdict, First Penalty Re-trial, and Appeal

The jury convicted Montiel of all counts and found two special circumstances that made Montiel eligible for the

death penalty: that the murder occurred in the commission of a robbery (the felony-murder special circumstance) and that the murder was intentional and carried out for financial gain (the financial-gain special circumstance). The jury hung on the penalty. At a penalty re-trial, a second jury sentenced Montiel to death. On direct appeal, the California Supreme Court set aside the financial-gain special circumstance and reversed the death sentence because of two instructional errors. *See Montiel I*, 39 Cal. 3d at 927–29.

## B.

At a second penalty re-trial in 1986, Montiel was represented by Robert Birchfield. The *Strickland* claims certified for appeal in our court concern Birchfield's performance. The following facts are consistent with the California Supreme Court's summary in its decision on direct appeal from the 1986 trial. *See Montiel II*, 5 Cal. 4th 877, 898–904 (1993).

### 1. Evidence of Gregorio Ante's Murder

Victor Cordova's 1986 testimony was mostly consistent with his 1979 testimony, albeit with some differences.[8] For example, at the 1986 penalty trial, Victor admitted, contrary to what he said in 1979, that he and Montiel had shared a PCP joint between the Mankin robbery and their departure from the Cordovas' house on Victor's motorcycle. While Victor had described Montiel's eyes only as "beady" and "glossy" at the 1979 trial, this time he remembered that "[t]hey were shifting back and forth real funny like" and

---

[8] Eva Mankin and Henry Ante had died by the time of the 1986 penalty trial, so their 1979 testimony was read to the jury. *See Montiel II*, 5 Cal. 4th at 898 n.2 & 899 n.3. David Ante and Victor Cordova testified live.

"wiggling" "in every direction." Victor echoed his testimony from 1979 that, after the killing, Montiel "said he did it just like you would do a goat," but this time he recalled that Montiel had said the day before that he had recently been "slaughtering sheep[] or cows or something" at a ranch. And in the 1986 trial, Victor testified that, after the killing, Montiel had produced not only twenty-dollar bills but ones and fives as well. On cross-examination, Victor admitted that Montiel had recently asked him to lie on the stand to say that Montiel had smoked more PCP the morning of the crimes than he actually did.

## 2.  Evidence of Montiel's Mental State and Intoxication

Both parties introduced expert evidence about Montiel's mental state and degree of intoxication on the morning of January 13, 1979.

As it had done in the 1979 trial, the State presented expert testimony from Dr. Siegel. He testified that, in addition to the preparation he had conducted for Montiel's first trial, he had since interviewed Montiel "to address the issue of his intoxication at the time of the commission of the offense."[9] In that interview, Dr. Siegel obtained Montiel's account of his history of drug use, his consumption of alcohol and PCP immediately before the crimes, and the crimes themselves. Dr. Siegel described Montiel's account as follows: Montiel started sniffing glue and drinking around age twelve. He sniffed ten to fifteen tubes of glue per day until age seventeen or eighteen. By age nineteen, he would

---

[9] Although Montiel had refused to speak with Dr. Siegel before his first trial, Dr. Siegel interviewed him in preparation for the first penalty re-trial in 1979 and relied on that interview for the opinions that he offered in the second penalty re-trial in 1986.

drink all day. From age thirteen to his early twenties, Montiel reported heavy use of amphetamines, barbiturates, tranquilizers, cocaine, LSD, and heroin, resulting in addiction, hallucinations, overdoses, blackouts, and amnesia. He started smoking PCP at age twenty-three. By age twenty-nine, Montiel recounted drinking alcohol and smoking two to three joints of PCP daily.

Dr. Siegel reviewed Montiel's psychological reports from 1972 to 1978 and testified that they showed no gross psychopathology but did mention aggression, a potential for violence, false bravado, manipulation, and grandiosity. Montiel admitted during the interview that he had a quick temper and would get violent when he was intoxicated, "when provoked," or "when it's called for." Montiel also admitted that he engaged in verbal arguments and fights when under the influence of alcohol, but he denied getting into serious fights or using weapons.

Through Dr. Siegel, Montiel's version of events and his reported confession to Michael Palacio were relayed to the jury. Dr. Siegel noted that Montiel reported drinking approximately one case of beer and smoking four to five PCP joints every day in January 1979. Montiel also reported that, on the morning in question, he woke up, smoked two PCP joints, and drank eight beers, after drinking alcohol and smoking PCP for most of the previous afternoon and evening. Dr. Siegel narrated the events of January 13 for the jury based on Montiel's account, his interviews with witnesses, and the testimony of Palacio. This version of events included Palacio's testimony that Montiel had confessed to killing Gregorio Ante after seeing money in the man's pocket.

Dr. Siegel opined that at the time of the crimes, there was no question that Montiel was "grossly intoxicated" from

PCP and alcohol. Dr. Siegel acknowledged that PCP has unpredictable effects and that it can reduce impulse control, cause hallucinations and delusions, produce episodic partial amnesia, and exaggerate aggressive or violent tendencies. He further recognized that extended use of PCP can lead to a chronic mental disorder. Nonetheless, Dr. Siegel observed that Montiel appeared capable of goal-directed activity, as demonstrated by his response to certain events, such as being concerned about having left fingerprints on Gregorio Ante's telephone, remembering the beer he left in Ante's house, and searching the house for money. Dr. Siegel noted that Montiel knew he was smoking PCP and drinking alcohol, was aware he killed an old man, described the manner of killing, and identified the salient events accurately. Dr. Siegel concluded that, on the day and at the time of the murder, Montiel was not hallucinating or experiencing PCP-induced psychosis. Dr. Siegel confirmed that his opinion was the same as it had been in 1979: Montiel appeared to be aware of his actions even though he was intoxicated.

The defense presented expert testimony from Dr. Louis Nuernberger, a psychiatrist formerly employed by the California Department of Corrections. Dr. Nuernberger had responsibility for inmate mental health concerns at San Quentin State Prison, and through his prison duties, acquired a familiarity with the drug and criminal histories of the inmates, which often included PCP use. Dr. Nuernberger had evaluated Montiel in 1979 or 1980, when Montiel first arrived on death row, to assess whether Montiel understood the nature of his sentence and the reasons for it. Dr. Nuernberger based his evaluation on an interview with Montiel, a report prepared by a psychologist, and a review of Montiel's prison file.

Dr. Nuernberger concluded that Montiel had a lifelong history of depression that led to his extensive drug abuse. Montiel's progression fit into a pattern that Dr. Nuernberger observed in many inmates at San Quentin—glue-sniffing as a young teenager that progressed to PCP use, caused by depression in childhood. Dr. Nuernberger testified that, as a free man, Montiel engaged in drug abuse and violence, but when institutionalized, Montiel conformed his behavior to the expectations of the prison and was compliant. Dr. Nuernberger testified that Montiel's use of PCP and alcohol likely eroded his faculties of judgment and self-control and that he was likely in a delirious state around the time of the crimes. In Dr. Nuernberger's estimation, Montiel's extended intoxication with PCP and alcohol were "directly responsible for the homicide," and his sanity at the time of the offense was "severely impaired if not totally lacking." Based on Montiel's progression of drug use and the combination of alcohol and PCP he had consumed, Dr. Nuernberger questioned whether Montiel was capable of deliberate action at the time of the offenses.

### 3. Prosecution's Aggravating Evidence of Montiel's Previous Crimes

The prosecution introduced evidence in aggravation showing that Montiel had previously committed five other violent crimes, two of which resulted in convictions.

- First, law enforcement officers testified that, in 1968, they responded to a call about a fight at the Montiel household. According to the officers, Montiel and his brother Antonio fought after Montiel tried to hit his mother, Hortencia, in the head with a telephone, and Montiel then cut Antonio in the chest with a butcher knife. Montiel's parents testified that

they did not recall the incident and denied statements attributed to them in the police report. Antonio testified that he did not know whether Montiel had cut him.

- Second, another officer testified that, in 1969, Montiel's then-wife, Rachel, reported that Montiel had hit her and had struck her sister in the abdomen while the sister was six months pregnant. Rachel testified, however, that her sister attacked Montiel and that Montiel never retaliated.

- Third, officers testified that, in 1971, they responded to an incident at the Kern County Fair when Montiel wrestled a stuffed animal from an older woman. After he failed to evade arrest, Montiel threatened to kill the officers' wives and children and burn their homes.

- Fourth, two employees of a restaurant testified that, in 1972, Montiel brandished a small handgun or starter pistol, demanded money, fled with thirty dollars, and fired several shots at an employee who followed him outside. Montiel pleaded guilty to second degree robbery, without enhancements for firearm or weapon use.

- Finally, a victim testified that, in 1973, he arrived home and caught Montiel stealing a television from his apartment. Montiel brandished a knife at him. Montiel pleaded guilty to misdemeanor burglary.

Officers testified that it was customary to indicate in the police report whether the suspect appeared to be under the influence of drugs or alcohol, and that none of the reports of those prior crimes referred to any suspicion of intoxication.

### 4. Montiel's Mitigating Evidence

The defense put on eighteen witnesses in addition to Dr. Nuernberger. The defense's theory was that Montiel had a relatively normal upbringing but became unstable and erratic when he became a heavy PCP user. The defense argued that Montiel's behavior was completely different when he was not under the influence of drugs, as demonstrated by his good conduct and rehabilitation in prison.

Members of Montiel's family testified that his family life was happy and that he was well-behaved and a good student until he started hanging out with the wrong crowd in high school and using drugs and alcohol. These witnesses indicated that Montiel was always respectful and nonviolent toward his parents, that family members visited him and exchanged letters with him while he was incarcerated, and that his family loved him. Rachel testified that, during their marriage, Montiel would sometimes become violent when drinking but said that he was a good father to their children, even after their separation.

Montiel presented evidence of his history of drug abuse. Family members recounted a pattern of substance abuse beginning with glue sniffing in his teenage years and progressing to regular use of alcohol and PCP during adulthood. Regarding the events of January 13, 1979, Montiel's sister Irene testified that he had smoked two PCP joints that morning. Other family members testified that he

had been hallucinating and talking incoherently in the days leading up to the murder.

Montiel presented evidence of his rehabilitation on death row. A prison chaplain testified that Montiel regularly attended voluntary religious services. A prison teacher said Montiel tried to improve his reading, writing, and mathematics skills and had made progress. A guard supervisor testified that Montiel presented no behavioral problems in San Quentin prison. A guard gave similar testimony about Montiel's conduct in the Kern County jail.

Montiel testified on his own behalf. He indicated that he had qualified for privileges on death row based on his good behavior. He confirmed the religious, educational, and artistic interests that he had developed in prison, and one of his paintings was admitted into evidence. Montiel indicated that, over time, he had developed empathy and remorse about Gregorio Ante's murder, saying that he knew "what it feels like to lose a family member." Montiel said that he would give his life to bring the victim back if that were possible.

### 5.  Penalty Verdict

With the parties' agreement, the trial court took judicial notice and advised the jury that the 1979 guilt-phase jury had found two special circumstances in connection with the murder: that the murder was intentional and carried out for financial gain (the financial-gain special circumstance) and that the murder was committed while Montiel was engaged in the commission of a robbery (the felony-murder special circumstance). The trial court did so despite the California Supreme Court's decision in *Montiel I* that the financial-gain special circumstance was inapplicable. *See Montiel II*, 5 Cal.

4th at 925–26.  After three days of deliberations and five ballots, the jury sentenced Montiel to death.

## C.

After the 1986 penalty trial, Montiel filed a timely notice of appeal.  In 1993, the California Supreme Court affirmed his death sentence.  *Id.* at 947.  The court rejected, among other arguments, Montiel's claim that Birchfield was ineffective for failing to prepare Dr. Nuernberger to testify, finding neither deficient performance nor prejudice.  *Id.* at 923–25.   In dissent, Justice Mosk concluded that Birchfield rendered ineffective assistance of counsel when he "egregiously failed to prepare his case for life" without parole.  *Id.* at 948 (Mosk, J., dissenting).

Montiel filed a state habeas petition in the California Supreme Court.  *See People v. Romero*, 8 Cal. 4th 728, 737 (1994) (explaining that California's constitution grants original jurisdiction in habeas corpus to the California Supreme Court).  After requesting and receiving an informal response to the petition from the State and a reply from Montiel, the California Supreme Court denied the petition in 1996.   The four-sentence order stated: "The motion for judicial notice of the records in the underlying appeals is granted.  The petition for writ of habeas corpus is denied. The delay in presentation of claims has been adequately explained.  All claims are denied on the merits."[10]  *In re*

---

[10] The order concluded with an unexplained citation to *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) (stating that when a state court invokes a state procedural bar as a separate basis for its decision, a federal court may not review the state's alternative holding on the merits of a federal claim).  The State does not argue that the California Supreme Court rested its decision on a finding of procedural default, and we discern no reason to conclude that it did.

*Montiel*, No. S033108, 1996 Cal. LEXIS 1048, at \*1 (Cal. Feb. 21, 1996).

In 1997, Montiel filed a 28 U.S.C. § 2254 habeas petition in the United States District Court for the Eastern District of California. The district court denied the petition in 2014. Montiel timely appealed.

## II.

We review de novo the district court's denial of Montiel's habeas petition. *Sanders v. Cullen*, 873 F.3d 778, 793 (9th Cir. 2017). Our review is circumscribed, however, by AEDPA.[11] *Lambert v. Blodgett*, 393 F.3d 943, 965 (9th Cir. 2004). AEDPA establishes a highly deferential standard for reviewing claims that a state court has "adjudicated on the merits." 28 U.S.C. § 2254(d). In such cases, a federal court may not grant habeas relief unless the state court's merits adjudication was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," *id.* § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

Montiel argues that the California Supreme Court's summary denial of his habeas petition means that his *Strickland* claims were not "adjudicated on the merits," as that phrase is used in § 2254(d). His argument relies on the specifics of California's habeas procedures. Under California law, a habeas petitioner bears the initial burden of

---

[11] Montiel filed his federal habeas application after April 24, 1996, so AEDPA applies to his case. *Sully v. Ayers*, 725 F.3d 1057, 1067 (9th Cir. 2013).

pleading adequate grounds for relief and must support the factual allegations in his petition with any "reasonably available documentary evidence supporting the claim." *People v. Duvall*, 9 Cal. 4th 464, 474 (1995). "An appellate court receiving such a petition evaluates it by asking whether, assuming the petition's factual allegations are true, the petitioner would be entitled to relief." *Id.* at 474–75. "If no prima facie case for relief is stated, the court will summarily deny the petition. If, however, the court finds the factual allegations, taken as true, establish a prima facie case for relief, the court will issue an [order to show cause]." *Id.* at 475. When an order to show cause issues, "the custodian of the confined person shall file a responsive pleading, called a return, justifying the confinement." *Id.* The petitioner then files a reply, called a traverse. *Id.* at 476–77. If there are disputed factual issues to resolve, the court may order an evidentiary hearing. *Id.* at 478. "Conversely, '[w]here there are no disputed factual questions as to matters outside the trial record, the merits of a habeas corpus petition can be decided without an evidentiary hearing.'" *Id.* (alterations in original) (quoting *People v. Karis*, 46 Cal. 3d 612, 656 (1988)).

Montiel argues that the California Supreme Court's four-sentence denial of his claims "on the merits," without issuing an order to show cause, signifies that the court concluded that his petition did not state a prima facie case for relief. Montiel contends that, because the state court evaluated only whether he had stated a prima facie case, it never reached a decision on the underlying merits of his *Strickland* claims. Accordingly, he argues, there is no "adjudication on the merits" to which we owe AEDPA deference under § 2254(d), and we should review his *Strickland* claims de novo.

We disagree. In *Cullen v. Pinholster*, 563 U.S. 170 (2011), the Supreme Court afforded AEDPA deference to the California Supreme Court's summary denial of a habeas petition raising a *Strickland* claim. *Id.* at 187–88. In that case, as here, the state court denied the petition without issuing an order to show cause.[12] The Supreme Court acknowledged California's procedural rules for state habeas petitioners, *id.* at 188 n.12, but held that "[s]ection 2254(d) applies even where there has been a summary denial," *id.* at 187. The Court then undertook a full merits evaluation of the *Strickland* claim, which included "a thorough review of the state-court record," *id.* at 188; *see also id.* at 189–203, asking whether the California Supreme Court had "unreasonably applied clearly established federal law to [Pinholster's] penalty-phase ineffective-assistance claim on the state-court record." *Id.* at 187.[13]

---

[12] In *Pinholster*, the California Supreme Court had summarily denied two separate state habeas petitions—one filed in 1993 and the other in 1997. *See* 563 U.S. at 177–78 (referring to both petitions). In ruling on the 1993 petition, the California Supreme Court issued an order to show cause, but then vacated that order as "improvidently issued" and summarily denied the petition "on the substantive ground that it is without merit." *In re Pinholster*, No. S034501, 1995 Cal. LEXIS 4500, at *1 (Cal. July 19, 1995). In ruling on the 1997 petition, the California Supreme Court summarily denied the petition "on the substantive ground that it is without merit" without issuing an order to show cause. *In re Pinholster*, No. S063973, 1997 Cal. LEXIS 6194, at *1 (Cal. Oct. 1, 1997).

[13] Pinholster argued to the Supreme Court that the state court's implicit determination—in summarily denying his petition without issuing an order to show cause—that Pinholster had not even made out a "prima facie" case for relief was contrary to, or an unreasonable application of, clearly established federal law. *See* Brief for Respondent at 52–53, *Pinholster*, 563 U.S. 170 (No. 09-1088), 2010 WL 3738678 ("[T]he California Supreme Court's determination that Pinholster's

We therefore must decide whether the denial of Montiel's claim "involved an unreasonable application of" *Strickland*.[14] *See* 28 U.S.C. § 2254(d)(1). Under that standard, Montiel must show "that 'there was no reasonable basis' for the California Supreme Court's decision." *Pinholster*, 563 U.S. at 188 (quoting *Harrington v. Richter*, 562 U.S. 86, 98 (2011)). In other words, Montiel must show that the state court's ruling on the claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."[15] *Richter*, 562 U.S. at 103.

---

allegations, taken as true, failed even to make out a *prima facie* claim was not only wrong, it was objectively unreasonable. It follows that § 2254(d) does not prohibit a grant of relief on the ground that trial counsel rendered constitutionally ineffective assistance at the penalty phase of Pinholster's capital trial."). Yet, rather than evaluate only whether Pinholster had made out a prima facie case in his state habeas petition, the Supreme Court evaluated the full merits of Pinholster's claims to assess whether the California Supreme Court could reasonably have denied habeas relief. *See Pinholster*, 563 U.S. at 189–203. To the extent that Montiel makes a similar argument to the one Pinholster made, we must reject it. *Pinholster* teaches that we must evaluate Montiel's *Strickland* claims in their entirety to determine whether the California Supreme Court could reasonably reject those claims on the merits.

[14] *Cannedy v. Adams*, 706 F.3d 1148 (9th Cir. 2013), does not support Montiel's position. In *Cannedy*, we treated a summary denial from the California Supreme Court as an "adjudication on the merits" under § 2254(d) and therefore applied AEDPA to our review of the petitioner's *Strickland* claim, evaluating the claim in light of the record before the California Supreme Court. *Id.* at 1155–57, 1162.

[15] To the extent that Montiel also argues that de novo review is warranted because the California Supreme Court failed to hold an evidentiary hearing, we reject the argument. *See Sully*, 725 F.3d at 1067 n.4 (holding that the California Supreme Court "does not fail to render an 'adjudication on the merits,'" as contemplated by § 2254(d), "just because it does not grant an evidentiary hearing"). Montiel has not

When reviewing a summary denial, we "look through" that judgment and apply the deferential standard to the last reasoned state court decision. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1194–95 (2018); *Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991). Where there is no reasoned state court decision addressing a claim, we must consider what arguments or theories could have supported the state court's summary denial, and then ask whether it is possible that fair-minded jurists could conclude that those arguments or theories are consistent with *Strickland*. *Richter*, 562 U.S. at 96, 102.

## III.

## A.

We begin by addressing the scope of the issues that we will consider. The district court certified two issues for appeal: first, whether Birchfield rendered ineffective assistance of counsel by failing to present independent expert testimony that Montiel's intoxication with PCP prevented him from harboring the mens rea necessary for the crimes;[16] and, second, whether Birchfield rendered

---

pointed to any disputed factual issues in his state habeas petition that he claims necessitated an evidentiary hearing, so he has not shown any flaw in the fact-finding process or unreasonable determination of the facts.

[16] Although the guilt-phase jury necessarily found, by convicting, that Montiel harbored the necessary mens rea for the crimes, Montiel's mental state was still a relevant consideration for the 1986 penalty-phase jury. Under California law, a defendant is permitted to present evidence to the penalty-phase jury that there is lingering doubt as to his guilt, as a mitigating factor for consideration in sentencing. *See People v. Terry*, 61 Cal. 2d 137, 147 (1964), *overruled on other grounds by People v. Laino*, 32 Cal. 4th 878, 893 (2004). The 1986 penalty-phase jury was also instructed under California's death penalty law, which requires the

ineffective assistance by failing to prepare Dr. Nuernberger to testify regarding Montiel's mental health.  Montiel also asks us to expand the COA to include two additional issues related to Birchfield's performance at the 1986 penalty trial: whether Birchfield was ineffective for failing to challenge the factual foundation underlying Dr. Siegel's expert opinion (specifically, Dr. Siegel's reliance on Palacio's testimony about Montiel's confession) and whether Birchfield rendered ineffective assistance by failing to investigate and present evidence of Montiel's psychosocial and family history to explain why he used PCP and other drugs.

We expand the COA to include those issues.  In *Browning v. Baker*, we held that a district court errs by limiting a COA to individual ineffective-assistance subclaims corresponding to particular instances of an attorney's conduct within a single trial.  875 F.3d. 444, 471 (9th Cir. 2017).  Because the Sixth Amendment right "is a guarantee of effective counsel *in toto*," we must "consider[] counsel's conduct *as a whole* to determine whether it was constitutionally adequate." *Id.*  Under *Browning*, therefore, we must consider the additional alleged errors in our analysis.  With the COA so expanded, we consider the broader issue whether Birchfield's performance, considered

---

jury to consider certain enumerated mitigating circumstances in selecting between sentences of death and life without parole.  *See* Cal. Penal Code § 190.3.  Evidence of Montiel's mental state would have been relevant to several mitigating factors.  Most relevant here, "factor (h) mitigation" requires the jury to consider "[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the [e]ffects of intoxication." *Id*. § 190.3(h).

as a whole, amounted to ineffective assistance of counsel at the 1986 penalty trial.

For reasons we explain in a memorandum disposition filed concurrently with this opinion, we decline to expand the COA to include the other issues that Montiel advances in his opening brief.

**B.**

We now turn to whether Birchfield provided ineffective assistance of counsel at the 1986 penalty trial. To prove a *Strickland* claim, Montiel must show (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish deficient performance, "the petitioner must show that counsel's representation 'fell below an objective standard of reasonableness' under 'all the circumstances.'" *Sully v. Ayers*, 725 F.3d 1057, 1068 (9th Cir. 2013) (quoting *Strickland*, 466 U.S. at 688). "To establish prejudice from counsel's errors during the penalty phase of a capital case, the petitioner must show that 'there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Id.* (quoting *Strickland*, 466 U.S. at 695). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Strickland*, 466 U.S. at 694). "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 112 (2011)). "If the state court reasonably concluded that [Montiel] failed to establish either prong of the *Strickland* test, then we cannot grant relief." *Cannedy v.*

*Adams*, 706 F.3d 1148, 1157 (9th Cir. 2013) (footnote omitted).

Montiel alleges that Birchfield's performance at the 1986 penalty trial was deficient because he failed to (1) present independent expert testimony from a psychopharmacologist that PCP prevented Montiel from forming a specific intent to commit robbery or murder; (2) adequately prepare Dr. Nuernberger to testify regarding Montiel's mental health; (3) challenge Dr. Siegel's reliance on Michael Palacio's testimony that Montiel formed the intent to kill Gregorio Ante after seeing money in his shirt pocket; and (4) investigate and present evidence of Montiel's psychosocial and family history.[17]  We assume, for the sake of argument, that these alleged errors constitute deficient performance under the first prong of *Strickland*.  We hold, however, under AEDPA's highly deferential standard of review, that the California Supreme Court could reasonably have concluded that Montiel's claim fails under the second prong of *Strickland*.  Comparing the mitigation evidence that was offered with what would have been offered but for Birchfield's alleged errors, the state court could reasonably have decided that there was not a substantial likelihood that the jury would have returned a different sentence if Birchfield had not performed deficiently.  *See Richter*, 562 U.S. at 102 (holding that, when a state court issues a

---

[17] The State argues that the sub-issue regarding Dr. Siegel's reliance on the Palacio confession is not exhausted because it was not presented to the California Supreme Court and that, in any event, Montiel forfeited the claim by failing to raise the allegations in his federal habeas application.  We need not decide whether the claim is unexhausted or forfeited because we conclude below that it fails.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

summary denial of a habeas claim on the merits, a federal habeas court must consider "what arguments or theories . . . could have supported[] the state court's decision").

## 1.

When a defendant has been convicted of first-degree murder with a special circumstance, California law allows a jury to impose a death sentence if it concludes that "the aggravating circumstances outweigh the mitigating circumstances." Cal. Penal Code § 190.3. The statute enumerates factors that the jury must consider, including the circumstances of the crime; the defendant's involvement in previous criminal activity that involved the use of force or violence; any prior felony convictions; whether the defendant was under the influence of an "extreme mental or emotional disturbance"; and other circumstances that extenuate the gravity of the crime. *Id*. § 190.3(a), (b), (c), (d), (k). Most relevant to this case, those factors also include so-called "factor (h) mitigation": "Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the [e]ffects of intoxication." *Id*. § 190.3(h).

In support of his state habeas petition, Montiel submitted mitigating evidence to the California Supreme Court that had not been presented at the 1986 penalty-phase trial. Specifically, he submitted declarations from his siblings Irene and Gilbert Montiel; his mother, Hortencia Montiel; clinical psychologist and psychosocial historian Dr. Gretchen White; clinical neuropsychologist Dr. Dale Watson; and psychiatrist Dr. Ferris Pitts. Below, we summarize the information provided in the declarations,

which we assume could have been introduced at the 1986 penalty-phase trial.

### a. Early Life

Dr. White's declaration provided an account of Montiel's childhood. Montiel is from a family of migrant agricultural workers. Neither of his parents was educated past elementary school, and both grew up in poverty, in families with significant histories of alcoholism. His mother, Hortencia, suffered from paranoid delusions and believed strongly in hexes, witchcraft, and the supernatural. His father, Richard, suffered from alcoholism, was rarely home, would disappear for months at a time, and often ended up in jail for alcohol-related crimes. When Richard drank, he was verbally and physically abusive to Hortencia.

Montiel spent much of his early life in the fields where he and his family worked. Hortencia worked in the fields while pregnant with Montiel "until the last minute before [she] gave birth." As a toddler, Montiel would stay in the car or play in the fields while his parents were working. When Montiel was four or five years old, he started working in the fields with Richard from before dawn until the evening. They routinely worked in areas heavily sprayed with pesticides but were given no protective clothing or gloves, even when picking cotton, which left numerous cuts on their hands. Montiel and his siblings frequently returned home covered in pesticides—Montiel's job was "to shake the trees so the fruit fell," which left him "covered with the dust they put on the trees." Montiel also harvested crops in fields adjacent to ones being sprayed and often would enter a field to continue working before the spray had settled; sometimes he worked as a "flagger," standing in the field and signaling to the crop-dusting planes where to begin and end their runs, which also exposed him to the pesticides.

Montiel often came home with irritated eyes, rashes, and headaches. In elementary school, Montiel started the school year late and was taken out of school for several weeks each fall to help pick fruit. He was embarrassed that everyone at school knew that he worked in the fields, and he was teased for being so poor.

Montiel's family lived in extreme poverty. Every summer, they lived in labor camps near the fields, in a tent with a dirt floor and no electricity or running water. When Montiel was almost four years old, the family moved into a one-bedroom house in Bakersfield next door to a cattle yard and slaughterhouse. The stench was overwhelming, and the house was infested with flies. It had no electricity and had running water only from a faucet in the front yard. The family sometimes went several days without food, subsisting on a mixture of flour, sugar, and water. Hortencia eventually received welfare assistance, on which the family depended. Montiel had one older half-sibling and five younger siblings, all but one of whom suffered from serious substance abuse, failed in school, and later spent time in jail or prison.

Montiel's drug abuse started early and progressed to dangerous levels by early adulthood. He began sniffing glue around age ten and used five or six tubes every day. He sniffed glue whenever he did not want to deal with "bad times," as when his father was gone or when the family ran out of money. By the time Montiel was sixteen or seventeen, he was sniffing glue less frequently, but he drank more alcohol and began abusing other drugs, including LSD and various prescription pills sold on the streets. When Montiel was twenty, he was taking about ten prescription pills per day. By 1972, at twenty-three years old, Montiel was injecting heroin four times a day and had been hospitalized three times for drug overdoses. In his late twenties, Montiel

started using PCP.  His siblings Gilbert and Irene, both of whom also used drugs heavily, remarked that Montiel acted like a different person on PCP, noting, among other strange behaviors, that PCP would cause him to talk about magic and the supernatural.

Montiel's drug abuse caused him to struggle in school and eventually led to repeated arrests and incarceration. Montiel first went to juvenile hall when he was eleven years old for breaking into school and stealing ice cream and fruit cocktail.  He was sent to a juvenile camp at age twelve for sniffing glue.  He rarely received good grades and failed 9th and 10th grades before dropping out of school.  From 1972 through 1977, during his twenties, Montiel was never out of state custody for more than a sixty-day period.

Montiel never learned to cope with depression or feelings of abandonment.  His parents did not model constructive ways of dealing with stressors or difficulties; rather, to deal with psychological pain, Montiel's father turned to alcohol or left the home, and his mother turned to magic and witchcraft.  From childhood through early adulthood, Montiel experienced loss and abandonment not only as a result of his father's disappearances and his mother's inability "to provide minimal parenting for [him]," but also due to the deaths of his infant daughter, two of his brothers, and several friends.

### b. Mental Health

After his arrest for the 1979 offenses, Montiel was evaluated by several mental health professionals.  One psychiatrist observed that Montiel was "chronically depressed and 'mind damaged,' if not brain damaged, by his extensive drug use."  The evaluations reflected that Montiel's "serious depression manifested as a cyclical

pattern of poor behavioral control" and that he had "deficits[] in judgment, self-control, and social skills as a consequence of toxic substance abuse, especially glue-sniffing, paint sniffing, and the continued use of PCP."

In 1993, Dr. Watson, the clinical neuropsychologist, evaluated Montiel and opined that he "suffers from cognitive and neuropsychological deficits and probable brain dysfunction," that he "functions at the level of borderline intelligence," and that he "is impaired by significant learning disabilities and very severe attention/concentration deficits (in the mildly retarded range)." Dr. Watson concluded that the onset of these deficits "dates at least from adolescence," based on Montiel's inability to perform at age-appropriate levels in reading and arithmetic. Dr. Watson concluded that Montiel's chronic inhalation of the neurotoxin toluene (found in glue) likely caused diffuse brain damage. Related impairments and neuropsychological deficits resulted in "poor planning skills," being "vulnerable to misinterpreting his environment with consequent manifestations of inappropriate and ill-modulated behavior," and having "difficulty in making judgments that require deliberation and consideration of abstract consequences." These deficits would be further exacerbated by alcohol or drug intoxication.

### c. Effects of PCP

Dr. Pitts, the psychiatrist, stated that PCP is a "dissociative anesthetic, which means that it impairs normal cognitive brain function" and causes bizarre and impulsive behaviors, including spontaneous violence. Dr. Pitts opined that when Montiel took Mankin's purse, he was acting on "sheer impulse" because the PCP prevented him from evaluating his behavior or making any moral judgments. Dr. Pitts noted that the fact that Montiel remained close to

Gregorio Ante's house and in plain sight immediately after the killing illustrated Montiel's "lack of cognitive functioning at the time of the homicide." Dr. Pitts also placed greater significance than Dr. Siegel had on Montiel's reported statements, following the murder, that he was the devil. According to Dr. Pitts, those statements strongly suggested that Montiel actually believed himself to be the devil, particularly when viewed in the context of his mother's beliefs in the supernatural and the evidence that Montiel had spoken of being the devil or talking to the devil in the two weeks before the murder. Contrary to Dr. Siegel's opinion, Dr. Pitts believed that Montiel was unable to harbor specific intent to steal or murder or to premeditate because he was in a dissociative animated state and was behaving "at the level of primitive reflex."

**2.**

To assess prejudice under *Strickland*'s second prong in a capital case, we must "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Pinholster*, 563 U.S. at 198 (quoting *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)). That analysis requires us to "compare the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently." *Clark v. Arnold*, 769 F.3d 711, 728 (9th Cir. 2014) (quoting *Murtishaw v. Woodford*, 255 F.3d 926, 940 (9th Cir. 2001)).

We consider first the new evidence from the declaration of Dr. Pitts regarding Montiel's diminished capacity from the effects of PCP at the time of the crimes. Some of that evidence would have been cumulative of the concessions that Birchfield extracted from Dr. Siegel and the testimony that Birchfield elicited from Dr. Nuernberger. For example, the jury knew from the expert testimony presented at trial

that PCP was a dissociative drug with unpredictable effects that could erode faculties of judgment and self-control. Dr. Siegel acknowledged that chronic use of PCP could cause delusional episodes. Dr. Nuernberger opined that Montiel was likely in a state of "toxic delirium" around the time of the crimes, considered Montiel's intoxication with PCP and alcohol to be "directly responsible for the homicide," and believed that Montiel's sanity at the time of the offense was "severely impaired if not totally lacking." The jury also knew—from the testimony of Montiel, his family members, and Dr. Siegel—that Montiel had consumed a significant amount of PCP in the days leading up to and on the morning of the murder, and that he had been hallucinating and behaving strangely. The primary contribution of the declaration from Dr. Pitts was his bottom-line conclusion that Montiel's use of PCP made him unable to harbor the specific intent for robbery or murder, but given Dr. Siegel's concessions, a reasonable jurist could view that conclusion as a relatively marginal addition to Montiel's case for "factor (h) mitigation."

The new expert testimony must also be viewed in light of the considerable evidence suggesting that Montiel was aware of his actions. As the California Supreme Court observed in rejecting one of Montiel's challenges to his sentence on direct appeal:

> The manner of killing suggested calculation and awareness. It was also clear that [Montiel] had ransacked Gregorio's residence and taken money. Moreover, Victor testified that moments after the crime, [Montiel] described it several times in graphic and coherent terms. Victor also indicated that [Montiel] carried away the

murder weapon and immediately returned to
the house to retrieve other evidence which
might link him to the homicide. [Montiel]
continued to boast about the killing as he was
driven away from the scene. He later asked
Victor to lie about the extent of his
intoxication.

*Montiel II*, 5 Cal. 4th at 921. The evidence concerning the
Mankin robbery was similarly suggestive: Montiel fled
Mankin's home with her stolen purse and apparently had the
presence of mind to remove the items of value—a
checkbook, several bank books, a knife, and some cash—
before discarding the purse. A reasonable jurist could
conclude that Dr. Pitts's opinion that Montiel was acting on
the level of "primitive reflex" would have been unlikely to
sway the jury, considering the circumstantial evidence that
Montiel was making decisions that reflected awareness and
at least some degree of rationality.

For similar reasons, a reasonable jurist could discount
the prejudicial impact of Birchfield's failure to challenge
Dr. Siegel's partial reliance, in forming his opinion, on the
apparently erroneous testimony of Michael Palacio. In his
1986 penalty-phase trial testimony, Dr. Siegel narrated the
events of January 13 as he understood them, based on his
interviews with witnesses and his review of the 1979 guilt-
phase trial transcripts. At the end of Dr. Siegel's narrative,
the prosecution asked whether he had considered Palacio's
testimony about Montiel's confession in jail. Dr. Siegel
responded affirmatively and stated:

> A: According to testimony from Michael
> Palacio, Mr. Montiel had entered the
> house, wanted to use the telephone and

noticed some money sticking out of this old man's pocket. At that point went into the kitchen to get a knife.

Q: For what purpose?

A: With the intent to kill him, according to Michael Palacio, that he formed the intent to kill him when he saw the old man with the money.

Palacio's version of events was inaccurate—the $180 that Gregorio Ante received from the piano sale and placed in his front shirt pocket was recovered on his body, suggesting that Montiel did not form the intent to kill Ante after deciding to steal that money. Montiel now contends that Palacio's false testimony formed the predicate for Dr. Siegel's conclusion that Montiel was capable of "goal-directed activity," and that Birchfield's failure to object or to effectively cross-examine Dr. Siegel prejudiced Montiel's defense.

The California Supreme Court rejected a similar argument on direct appeal, noting that, even without Palacio's testimony, there was a wealth of circumstantial evidence that Montiel knew what he was doing. *Montiel II*, 5 Cal. 4th at 921. Indeed, Palacio's testimony was only one of several factors that led Dr. Siegel to conclude that Montiel had the capacity to understand the nature of his conduct—other factors included, for example, Montiel's concern that he had left behind evidence connecting him to the crime and his search of the house for money.

Besides, Birchfield did take steps to undermine the narrative offered by Dr. Siegel, prompting the prosecution to present an alternative theory of the robbery-murder.

Specifically, Birchfield presented testimony from an investigator with the Kern County Sheriff's Office, who clarified for the jury that $180 was found on Ante's body, in a front T-shirt pocket that was concealed by an outer layer. On cross-examination, the prosecution showed the jury a close-up photograph of Ante's pants pockets—which, according to Ante's son Henry, had contained $12 in bills of small denominations on the morning of the murder—and the investigator confirmed that those pants pockets were found empty when investigators arrived at the scene. A reasonable jurist could conclude, therefore, that the jury was aware of the flaw in the narrative offered by Palacio and repeated by Dr. Siegel—but that the jury nonetheless concluded that Montiel had intentionally killed Ante in the process of robbing him of the money in his pants pockets, even if not for the money in his shirt pocket.

That leaves Montiel's psychosocial history and mental health evidence. Some of this evidence would have been cumulative. For example, the jury already knew that Montiel started sniffing glue at a young age before turning to heavier drugs. In addition, Dr. Nuernberger had offered the opinion, albeit without much substantiating detail, that Montiel's drug use stemmed from a deep-seated, lifelong depression and had described Montiel's compliant behavior in the controlled, drug-free prison environment.

Still, much of the psychosocial history was new, and that history presented a starkly different narrative than the story of a relatively normal childhood that Birchfield presented to the jury. A complete picture of Montiel's childhood would have helped the jury understand that Montiel's behavior as an adult was not, as the prosecution put it, "a conscious choice for his life, for violence, greed, and drug use." Rather, the jury would have understood that Montiel's

criminal behavior was rooted in early traumatic experiences and the impoverished conditions of his upbringing.[18]  The new mental health evidence also offered a non-cumulative and more robust assessment of Montiel's cognitive and neuropsychological deficits, which the jury could have considered in mitigation.  *See Boyde v. California*, 494 U.S. 370, 382 (1990) ("[E]vidence about [a] defendant's background and character is relevant [at sentencing] because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." (emphasis omitted) (quoting *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304, 320 (2002))).

We assume that Birchfield's failure to present to the jury this more sympathetic picture of Montiel's childhood suffering constituted deficient performance.  But we cannot say that the California Supreme Court would have been unreasonable in holding that the error did not prejudice the defense sufficiently to undermine confidence in the outcome of the penalty-phase trial.  The prosecution's case in aggravation was relatively strong, showing that Montiel had engaged in a prior pattern of violence, with one incident resulting in a felony conviction.  The jury was also aware of the gruesome nature of the murder and was instructed that

---

[18] In support of his state habeas petition and this appeal, Montiel provided a declaration from Dr. Thomas Milby about the medical effects of pesticide exposure.  Montiel does not dispute that he failed to present this declaration to the district court, and his arguments on appeal do not appear to rely on the declaration.  We therefore do not consider it.

the 1979 guilt-phase jury had found felony-murder and financial-gain special circumstances.[19]

Montiel relies on *Rompilla v. Beard*, 545 U.S. 374 (2005), *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Bean v. Calderon*, 163 F.3d 1073 (9th Cir. 1998), but we are not persuaded by his comparisons. In all three of those cases, the court was not bound to apply AEDPA deference in its prejudice analysis and thus conducted its inquiry de novo before granting habeas relief. *Rompilla*, 545 U.S. at 390; *Wiggins*, 539 U.S. at 534; *Bean*, 163 F.3d at 1077. The issue before us is not whether we would have reached a different conclusion in this case on de novo review, but rather whether we can reach such a conclusion under AEDPA's standard of review. "Even if *we* would grant federal habeas relief upon de novo review, § 2254(d) precludes such relief if there are 'arguments that would otherwise justify the state court's result.'" *Sully*, 725 F.3d at 1067 (quoting *Richter*, 562 U.S. at 102). For the reasons above, we conclude that such arguments exist here.

---

[19] As previously noted, the California Supreme Court had set aside the financial-gain special circumstance on direct appeal before reversing Montiel's death sentence from the first penalty re-trial on other grounds. *Montiel I*, 39 Cal. 3d 910, 927–29 (1985). Notwithstanding that decision, the trial court, with the parties' consent, improperly instructed the 1986 penalty-phase jury that the guilt-phase jury had found the financial-gain special circumstance. *See Montiel II*, 5 Cal. 4th at 925–26. The California Supreme Court addressed the prejudicial impact of the error in *Montiel II*, concluding that the mistake did not undermine confidence in the judgment. *Id.* at 925–26 & 926 n.20. The court explained that nothing in its previous decision striking the financial-gain special circumstance "precluded this penalty jury from learning that its predecessor found an intentional killing." *Id.* The California Supreme Court's conclusion that the error probably had a minimal impact on the prosecution's case in aggravation was reasonable.

Montiel also cites *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam), in which the Supreme Court found prejudice under AEDPA's deferential standard. But that case is distinguishable. In *Porter*, the prosecution's case for aggravation consisted only of the circumstances surrounding the crimes themselves—Porter had no other criminal history. The defense put on virtually no case for mitigation: "The judge and jury at Porter's original sentencing heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability." *Id.* at 41. A proper investigation would have uncovered evidence that Porter was a decorated war hero who suffered from PTSD as a result of his combat experience, that Porter's childhood included a history of physical abuse, and that Porter suffered from neurological deficits that impaired his ability to conform his conduct to the law. *Id.* at 33–37. Here, by contrast, the prosecution's case for aggravation was substantial, and, notwithstanding the alleged errors made by Birchfield, the jury did hear substantial mitigation presentation, including testimony from nineteen witnesses.

In short, weighing the aggravating circumstances against the totality of the mitigating evidence—and applying, as we must, AEDPA's very deferential standard of review—we hold that a reasonable jurist could conclude that Montiel failed to establish prejudice from Birchfield's errors.

## IV.

For the foregoing reasons, we conclude that the California Supreme Court's summary denial of Montiel's ineffective assistance of counsel claims was not an unreasonable application of *Strickland*. We therefore **AFFIRM** the judgment of the district court denying Montiel's application for a writ of habeas corpus.